JOHN C. PORFILIO, Circuit Judge.
Martin Barajas-Chavez stood trial on charges of knowingly transporting two named undocumented aliens in furtherance of the aliens’ illegal presence within the United States, a violation of 8 U.S.C. § 1324(a)(l)(A)(ii). At the end of the trial, Mr. Barajas-Chavez moved for judgment of acquittal, arguing there was insufficient evidence to show he acted “in furtherance of’ his passengers’ illegal presence within the United States. The district court took Mr. Barajas-Chavez’ motion under advisement and submitted the ease to the jury. The jury returned a guilty verdict, but the district court, acting on Mr. Barajas-Chavez’ motion, set the verdict aside and entered a judgment of acquittal on the ground the evidence was insufficient to support the conviction. The government appeals the district court’s ruling. We affirm.
I
Mr. Barajas-Chavez, an illegal alien, lost his job in the Arizona flagstone quarries following an immigration inspection and decided to go to Denver to look for work.[1] As Mr. Barajas-Chavez discussed his plans with friends and acquaintances, others agreed to accompany him. Arturo Lopez-Arrellano, one of Mr. Barajas-Chavez’ relatives, wished to go to Denver and mentioned Jesus Macias-Lopez, an acquaintance, might also be interested. Mr. Macias-Lopez knew Denver well and would be able to orient the group upon their arrival. Mr. Barajas-Chavez approached Mr. Macias-Lopez and Mr. Macias-Lopez’ brother in a hotel lobby and told them about his plans, and they expressed an interest in going. When the group left Phoenix, it had swelled to eleven people: Mr. Barajas-Chavez; Mr. Lopez-Arrellano; Mr. Macias-Lopez; Mr. Macias-Lopez’ brother; Pedro and Maria Ramona and their two children; a female friend of the Ramonas; and two other, unnamed passengers.
*1446 In preparation for the journey, Mr. Bara-jas-Chavez purchased a camper shell at a yard sale for his pickup truck; some, but not all, of the camper shell’s windows had been painted by a previous owner. Mr. Macias-Lopez gave Mr. Barajas-Chavez $150 for vehicle expenses on the trip. Mr. Lopez-Arrellano paid $50 to fill the pickup truck’s gas tanks. Pedro Ramona gathered $250 for expenses from the other passengers. In all, the ten passengers gave Mr. Barajas-Chavez approximately $450.
The group set out from Phoenix bound for Denver. They stopped in Flagstaff for dinner, and the passengers moved freely about during this and other stops. At 3:00 a.m., police stopped Mr. Barajas-Chavez at a temporary roadblock on 1-40 in McKinley County, New Mexico. At the roadblock, Joseph Garcia, an INS agent, asked Mr. Barajas-Chavez if he had any documentation showing he was in the United States legally. Mr. Barajas-Chavez admitted he was in the United States illegally and did not have any documentation. Agent Garcia saw a man and a woman in the cab with Mr. Barajas-Chavez, and, shining his flashlight into the camper shell, Garcia could see eight other people lying in the back of the truck. Agent Garcia questioned the passengers, each of whom admitted being undocumented. Garcia and other INS agents on the scene placed Mr. Barajas-Chavez and all the passengers under arrest. Mr. Barajas-Chavez was eventually charged with the transportation of Mr. Macias-Lopez and Mr. Lopez-Arrellano in furtherance of their illegal presence within the United States in violation of 8 U.S.C. § 1324(a)(l)(A)(ii).
At trial, the government’s case consisted of testimony from Mr. Macias-Lopez, Mr. Lopez-Arrellano,[2] and arresting agents Joseph Garcia and Steve Alba. Agents Garcia and Alba testified to the events surrounding the detection and arrest of Mr. Barajas-Chavez and his passengers. The agents said Mr. Barajas-Chavez told them he was charging his passengers $300 each for the transportation. Agent Garcia also observed, in his experience, alien smugglers frequently use camper shells with darkened windows to conceal their cargo and make their illegal passengers lie down to escape detection.
In his testimony, Mr. Lopez-Arrellano said he had initially told immigration officials he met Mr. Barajas-Chavez for the first time in Phoenix and paid $250 to be transported to Denver. Mr. Lopez-Arrellano admitted that these statements were untrue, that Mr. Ba-rajas-Chavez was a relative, whom he had known for some time, and that he had only given $50 to Mr. Barajas-Chavez for gas. The familial relationship was later confirmed by other witnesses.
At the end of the trial, defense counsel moved for a judgment of acquittal based on insufficiency of the evidence. The district court took the motion under advisement and submitted the case to the jury. The jury returned a guilty verdict. The district court subsequently set the verdict aside and entered a judgment of acquittal. In its order, the district court stated:
In this case Defendant, Defendant’s relative, and an acquaintance of Defendant’s relative, were driving to Denver in search of employment. This was not a furtive transportation of undocumented aliens which inhibits government enforcement of immigration laws but was an act merely incidental to the aliens’ presence here and is too attenuated to constitute a furtherance of their illegal presence. Specifically, the Court finds that the relationship between Defendant and the passengers, the fact that the transportation was not committed for profit, and the lack of furtiveness or concealment indicate this transportation was not “in furtherance” of the aliens’ violation of law. The evidence, when viewed in the light most favorable to *1447 the Government, does not support the jury’s verdict.
This appeal ensued.
II
A district court decision setting aside a jury verdict and granting a judgment of acquittal is entitled to no deference on appeal, and we review it de novo. United States v. Santistevan, 39 F.3d 250, 255 (10th Cir.1994). We must therefore view the direct and circumstantial evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt of each element of the crime. Id.; United States v. Evans, 42 F.3d 586, 589 (10th Cir.1994); United States v. Calloway, 562 F.2d 615, 617 (10th Cir.1977).
The statute upon which the government’s case rests, 8 U.S.C. § 1324(a)(l)(A)(ii), provides “[a]ny person who ... knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law ... shall be punished. ...” Mr. Barajas-Chavez was charged with illegally transporting Mr. Macias-Lopez and Mr. Lopez-Arrellano. Evidence presented at trial clearly demonstrates Mr. Barajas-Chavez knew or had reason to know these two passengers were undocumented aliens and transported them from Arizona to New Mexico. The only issue in this appeal is whether the evidence presented at trial was sufficient to prove Mr. Barajas-Chavez conducted this transportation “in furtherance of’ Mr. Macias-Lopez’ and Mr. Lopez-Arrellano’s illegal presence within the United States.
Section 1324 does not define the phrase “in furtherance of.” However, courts seeking to define the phrase and evaluate the evidence required to prove the element have found it probative (1) the defendant profited from the transportation; (2) the defendant actively attempted to conceal the passengers; and (3) the passengers were mere “human cargo” (i.e., the passengers were not related to the defendant by blood, friendship, or acquaintance and their movements were guided, dictated, or controlled by the defendant during the transportation). See, e.g., United States v. Parmelee, 42 F.3d 387, 391 (7th Cir.1994) (discussing evidence relevant to an “in furtherance of’ inquiry); United States v. 1982 Ford Pick-Up, 873 F.2d 947, 951 (6th Cir.1989) (same). In general, the central object of inquiry is the defendant’s purpose in conducting the transportation, rather than the transportation’s logical result or effect. See United States v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th Cir.1994) (holding legally sufficient evidence existed to support the jury’s conclusion “defendant had the intent to further the aliens’ presence” in the United States); United States v. Perez-Gomez, 638 F.2d 215, 218-19 (10th Cir.1981) (holding evidence “amply demonstrate^] [the defendant’s] concern that the aliens be kept secreted to avoid suspicion”); United States v. Salinas-Calderon, 585 F.Supp. 599, 602 (D.Kan.1984) (holding the government “failed to prove beyond a reasonable doubt that the defendant acted in willful furtherance of the aliens’ illegal presence in the United States”).
The paradigmatic conduct proscribed by the statute is well-represented' by United States v. Perez-Gomez, 638 F.2d 215, 218 (10th Cir.1981), in which the defendant attempted to transport nineteen undocumented aliens in a van from Los Angeles to Chicago. In Perez-Gomez, the alien passengers had crossed the United States border illegally only days before the transportation, and the defendant made all the arrangements for food and accommodations during the trip. Id. The defendant had not met any of the passengers before transporting them, and none of the aliens even knew the defendant’s name until the arresting officers mentioned it. Id. A partition had been placed between the driver and the cargo area of the van, concealing the passengers; and before setting out for Chicago, the defendant led the passengers two at a time from a hotel room, locking each pair inside the van before returning to the room to escort another. Id. After the trip began, the nineteen passengers were confined in the back of the van for twenty-eight hours without an opportunity to *1448 eat or leave. Id. Cases like Perez-Gomez fit squarely within the prohibition of the statute.
At the other end of the spectrum he cases like United States v. Salinas-Calderon, 585 F.Supp. 599 (D.Kan.1984), in which the defendant set out to transport six undocumented aliens in a pickup truck from Colorado to Florida:
Mr. Salinas-Calderón knew his passengers for about four months prior to their trip, ... they worked together, and ... they were on friendly terms with each other. The defendant and the aliens individually planned to go to Florida; the defendant planned to drive his family in their pickup, and he agreed to give his coworkers a ride. They shared the expense of the trip; the defendant was not compensated in any way. The vehicle was not specially designed to conceal the passengers, and there was no attempt to conceal or harbor the passengers.
585 F.Supp. at 602. Cases like Salinas-Calderon, in which the defendant and the passengers are friends, family, or acquaintances simply pooling their resources during travel, fail to demonstrate an intent to transport undocumented aliens “in furtherance of’ their unlawful presence within the United States and therefore fall outside the range of activities prohibited by the transportation statute.
The district court, relying in part on Salinas-Calderon, ruled the evidence presented at Mr. Barajas-Chavez’ trial was insufficient to show the transportation of the two aliens named in this case was “in furtherance of’ the aliens’ violation of the law. In reaching this conclusion, the district court found (1) Mr. Barajas-Chavez did not receive compensation for transporting the named undocumented aliens, (2) Mr. Barajas-Chavez made no attempt to conceal his passengers, and (3) the relationship between Mr. Barajas-Chavez and the named passengers refuted any inference the passengers were “human cargo.” The government maintains the district court’s conclusions are unsupported by the record, the opposite conclusions are supported by the record, and the jury’s verdict is therefore valid. In addition, the government contends, even if the record does support the district court’s factual findings, evidence presented at trial showing Mr. Ba-rajas-Chavez knowingly transported the named undocumented aliens a substantial distance for the purpose of seeking employment proves the “in furtherance of’ element and supports the jury’s verdict. We consider each of these arguments in turn.

A. The district court’s factual fíndings.

The government claims the evidence presented at trial was sufficient for a reasonable jury to find: (1) Mr. Barajas-Chavez intended to charge each of his passengers $300 for their transportation and therefore intended to profit from the transportation; (2) Mr. Barajas-Chavez attempted to conceal the passengers during the journey by purchasing a camper top with darkened windows for the pickup truck and having the passengers lie down in the bed of the truck; and (3) Mr. Barajas-Chavez did not know the majority of his passengers, indicating his passengers were mere “human cargo.” The jury’s ability to reach these conclusions from the evidence presented at trial, the government argues, adequately supports the “in furtherance of’ element of the transportation charge, and therefore renders the district court’s judgment of acquittal invalid.
The testimony of Agents Garcia and Alba, the government argues, shows Mr. Barajas-Chavez intended to profit from the transportation. Agent Garcia testified Mr. Barajas-Chavez “had $860 that he had collected from [the passengers], or $300 that he was going to charge.” Agent Alba testified Mr. Bara-jas-Chavez told him “he was transporting [the illegal aliens] to the Denver, Colorado, area, and that he was charging them a fee of approximately $300 per person.” These statements, even if accepted as true, do not indicate whether Mr. Lopez-Arrellano or Mr. Macias-Lopez, the aliens actually named in the indictment, were among those persons being charged for the transportation. The alleged statements do not indicate all of the truck’s occupants were to be charged, and no specific evidence indicating Mr. Lopez-Arrel-lano or Mr. Macias-Lopez were “charged” anything for the trip was presented at trial. However, the evidence in the record does *1449 show Mr. Lopez-Arrellano and Mr. Macias-Lopez agreed to “chip in” for the expenses of the trip. Mr. Lopez-Arrellano testified he spent $50 to fill the gasoline tanks of the pickup truck, and Mr. Macias-Lopez testified he agreed to pay $150 toward vehicle expenses for the trip. This evidence indicates the financial arrangements between Mr. Ba-rajas-Chavez, Mr. Macias-Lopez, and Mr. Lopez-Arrellano were cooperative. The record therefore does not support the conclusion Mr. Barajas-Chavez intended to profit from transporting Mr. Macias-Lopez and Mr. Lopez-Arrellano.
The government claims the darkened windows of the camper shell and the passengers’ reclining position in the pickup bed indicate Mr. Barajas-Chavez intended to conceal the undocumented aliens during their transportation. Assuming the relevance of the evidence where the indictment charges transportation of only two aliens, the inference is not tenable in light of other evidence presented at trial. Some of the camper shell’s windows were unpainted, and Agent Garcia could see the passengers simply by looking through a window with his flashlight. Mr. Barajas-Chavez did not paint the windows of the camper shell himself; they had been painted before he purchased the shell, and yet no effort was made to darken the remaining windows. During the trip, many of the passengers, including Mr. Lopez-Arrellano, sat in the cab with Mr. Barajas-Chavez, in plain view of persons outside the truck. During stops for food and gas, the passengers did not behave in a furtive manner, and Mr. Barajas-Chavez and the other passengers made no effort to conceal their undocumented status when questioned by Agents Garcia and Alba. Although the passengers were lying down when the truck entered the roadblock, there is nothing unusual about passengers lying down at 3:00 a.m. on a long road trip. The only evidence supporting an inference of concealment, therefore, is Agent Garcia’s testimony that, in his experience, darkened windows and reclining passengers are indicative of an alien smuggler’s attempt to conceal his cargo. No reasonable trier of fact could conclude from the evidence presented at trial Mr. Barajas-Chavez intended to conceal his passengers.
The government claims Mr. Macias-Lopez was a stranger to Mr. Barajas-Chavez prior to the transportation and submits the lack of prior relationship indicates Mr. Macias-Lopez was “human cargo.” However, knowing a person for only a short time before transporting him or her does not by itself indicate the person is a defendant’s “human cargo;” something more is required. The trial testimony shows Mr. Macias-Lopez was Mr. Lopez-Arrellano’s acquaintance and Mr. Bara-jas-Chavez approached Mr. Macias-Lopez on his relative’s suggestion. Mr. Barajas-Chavez did not curtail, control, or dictate Mr. Macias-Lopez’ movements during the trip. No reasonable trier of fact could conclude from this evidence Mr. Macias-Lopez was “human cargo.”
The evidence in the record does not show Mr. Barajas-Chavez profited or intended to profit from transporting Mr. Lopez-Arrella-no or Mr. Macias-Lopez. Nor does the evidence show Mr. Barajas-Chavez sought to conceal Mr. Lopez^-Arrellano or Mr. Macias-Lopez, either by ordering them to remain concealed in the camper or by purposefully darkening the camper shell windows in preparation for the trip. Finally, the evidence indicates Mr. Lopez-Arrellano and Mr. Macias-Lopez were not human cargo, but rather Mr. Barajas-Chavez’ relative and acquaintance. We therefore find no error in the district court’s factual findings.

B. Transportation a substantial distance for the purposes of seeking employment.

The government contends, even if the district court’s factual findings are not in error, the jury verdict is nonetheless supported by the evidence. The government claims the prosecution established the “in furtherance of’ element of 8 U.S.C. § 1324(a)(l)(A)(ii) by showing Mr. BarajasChavez knowingly transported undocumented aliens a substantial distance for the purpose of seeking employment. Employment within the United States, the government argues, is an undocumented alien’s “life-line” to this country and enables the alien to obtain food, shelter, and other neces *1450 sities, thereby permitting the undocumented alien to maintain his or her illegal presence within the United States. When a defendant transports an undocumented alien to a place in which the alien can seek employment, the government contends, the defendant necessarily “furthers” the alien’s illegal presence. Under this theory, the government has presented sufficient evidence to support the “in furtherance of’ element of the conviction by demonstrating Mr. Barajas-Chavez transported Mr. Macias-Lopez and Mr. Lopez-Arrellano from Arizona to New Mexico for the purpose of seeking employment in Denver.
The majority of courts interpreting § 1324(a)’s “in furtherance of’ language have rejected the reasoning the government urges here. Transportation of an undocumented alien simply for the purpose of seeking or enabling employment is not, by itself, prohibited by the statute. See 1982 Ford Pick-Up, 873 F.2d at 952 (reversing forfeiture of vehicle because defendant merely transported aliens for purpose of seeking employment, a showing which was insufficient to prove the “in furtherance of’ element of the transportation charge); United States v. Moreno, 561 F.2d 1321, 1322 (9th Cir.1977) (holding transportation of illegal aliens during the ordinary and required course of the defendant’s employment “was only incidentally connected to the furtherance of the [aliens’] violation of law, if at all”); United States v. Moreno-Duque, 718 F.Supp. 254, 259 (D.Vt.1989) (concluding the transportation statute requires “more than mere knowing employment and employment-related transportation of illegal aliens to satisfy all of its essential elements”); United States v. One 1982 Toyota SR 5 Pick-Up Truck, 642 F.Supp. 335, 338 (N.D.Ill.1986) (rejecting the “government’s position that all transportation in the employment context of known and undocumented aliens is in furtherance of their unlawful presence within the meaning of [the transportation statute]”); Salinas-Calderon, 585 F.Supp. at 602-03 (rejecting argument that a defendant’s transportation of illegal aliens to an area where the aliens might obtain employment could, by itself, satisfy the “in furtherance of” element of the transportation charge). Furthermore, the government’s focus on the possible effect of the defendant’s transportation — the prospective employment of the defendant’s passengers and the potential for resulting sustenance — is misplaced given § 1324’s focus on the defendant’s intent in conducting the transportation. See, e.g., 1982 Ford Pick-Up, 873 F.2d at 951 (“To be found guilty of violating [the transportation statute] the government must prove that the defendant transported an alien with the purpose of supporting or promoting his or her illegal presence.”); Moreno-Duque, 718 F.Supp. at 259 (“In other words, the government must prove that the defendants specifically intended by means of the transportation to advance or assist the alien’s violation of law, not merely that the effect of the transportation was to allow the alien to remain in the United States.”). We hold therefore, the government cannot meet its burden to prove a defendant’s transportation of an illegal alien is in furtherance of that alien’s illegal presence within the United States simply by showing the defendant has transported the alien a substantial distance for the purpose of seeking employment. Because no reasonable trier of fact could conclude from the evidence on record that Mr. Barajas-Chavez’ transportation of the undocumented aliens named in this case was conducted “in furtherance of’ those aliens’ illegal presence within the United States, we AFFIRM the district court’s judgment of acquittal.

. The following facts were abstracted from uncontested testimony presented at trial. Where witness testimony is conflicting or subject to interpretation, we have identified the witness who provided the testimony.

. Agent Garcia testified Mr. Barajas-Chavez’ passengers were interviewed for the purpose of enlisting them as material witnesses, but only Mr. Lopez-Arrellano and Mr. Macias-Lopez were deemed "credible.” In exchange for their testimony, Mr. Lopez-Arrellano and Mr. Macias-Lopez received temporary social security cards and temporary work permits, valid through the end of Mr. Barajas-Chavez' trial. The other passengers were allowed to voluntarily return to Mexico.