**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 7 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

MARTIN BARAJAS-CHAVEZ,

Defendant-Appellee.

No. 97-2033

---

**OPINION ON REHEARING EN BANC**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-96-174-MV)

---

John J. Kelly, United States Attorney (Fred J. Federici and Jason Bowles, Assistant United States Attorneys, with him on the brief), Las Cruces, New Mexico, for the appellant.

Floyd W. Lopez, Albuquerque, New Mexico, for the appellee.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO**, **ANDERSON**, **TACHA**, **BALDOCK**, **BRORBY**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Defendant Martin Barajas-Chavez was convicted by a jury of transporting two illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). On defendant's motion at the conclusion of the case, the district court set aside the jury's verdict and entered a judgment of acquittal on the ground that the evidence was insufficient to demonstrate defendant acted knowingly "in furtherance of" the aliens' illegal presence in the United States. After rehearing the case en banc, we reverse and remand with directions to the district court to reinstate the jury's verdict.

I.

On March 10, 1996, New Mexico state police established a roadblock on Interstate 40 in Gallup, New Mexico, to check for drunk drivers. Agents from Immigration and Naturalization Service were on hand in case the police discovered illegal aliens. At approximately 2:30 a.m., the police stopped a pickup truck driven by defendant. After checking defendant's license and registration, the police requested assistance from INS Agent Joseph Garcia. Upon questioning by Garcia, defendant admitted he was an illegal alien. In addition to defendant, there were ten passengers in the pickup, all of whom were determined to be illegal aliens.

Defendant was indicted on two counts of transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). More specifically, he was charged with

transporting two of the ten illegal aliens found in the pickup, Arturo Lopez-Arellano and Jesus Macias-Lopez. A jury convicted defendant on both counts. The district court initially denied defendant's motion for judgment of acquittal at the conclusion of the evidence at trial, but defendant renewed his motion following the verdict and the court granted the motion. United States v. Barajas-Chavez, 991 F. Supp. 1289 (D. N.M. 1996).

In granting the motion for judgment of acquittal, the district court focused on the "in furtherance of" element of § 1324(a)(1)(A)(ii), and concluded it recognized a distinction between "those who support the presence of illegal aliens in this country through a smuggling operation or some other form of illicit transportation," and those "'who come into daily contact with undocumented aliens and who, with no evil or criminal intent, intermingle with them socially or otherwise.'" Id. at 1292 (quoting United States v. Moreno, 561 F.2d 1321, 1323 (9th Cir. 1977)). Based upon this perceived distinction, the court proceeded to review the evidence for the presence or absence of three factors: whether defendant received compensation for transportation, whether defendant took precautionary efforts to conceal the illegal aliens, and whether the illegal aliens were defendant's friends or coworkers or were merely human cargo. Although the court acknowledged defendant and his passengers were traveling "to Denver in search of employment," id. at 1294, it found defendant (1) did not profit from

his transportation of Lopez-Arellano and Macias-Lopez, (2) did not attempt to conceal any of the illegal aliens, and (3) was a relative of Lopez-Arellano and an acquaintance of Macias-Lopez. The court concluded defendant's transportation of the two illegal aliens "was an act merely incidental to the aliens' presence [in this country] and [wa]s too attenuated to constitute a furtherance of their illegal presence." Id.

The district court's decision was originally affirmed in United States v. Barajas-Chavez , 134 F.3d 1444 (10th Cir. 1998).

II.

Defendant was charged with and convicted of violating 8 U.S.C. § 1324(a)(1)(A)(ii), which makes it illegal for

> [a]ny person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

To establish a violation, the government must prove "(1) the transporting or moving of an alien within the United States, (2) that the alien was present in violation of law, (3) that the defendant was aware of the alien's status, and (4) that the defendant acted willfully in furtherance of the alien's violation of the law." United States v. Diaz , 936 F.2d 786, 788 (5th Cir. 1991) (examining predecessor statute); see United States v. Hernandez , 913 F.2d 568, 569 (8th Cir.

-4-

1990) (same); see also United States v. Parmelee, 42 F.3d 387, 391 (7th Cir. 1994) ("a defendant's guilty knowledge that his transportation activity furthers an alien's illegal presence in the United States is an essential element of the crime"). Only the "in furtherance of" element is at issue in this appeal.

We have previously considered convictions under the identically-worded predecessor statute to § 1324(a)(1)(A)(ii). See United States v. Chavez-Palacios, 30 F.3d 1290 (10th Cir. 1994); United States v. Perez-Gomez, 638 F.2d 215 (10th Cir. 1981). In both cases, we briefly discussed the "in furtherance of" element. Today, we are called upon to more fully analyze the element and to determine whether evidence presented by the government in this case was sufficient to satisfy that element.

We begin with the language of the statute. See Muscarello v. United States, 118 S. Ct. 1911, 1914 (1998). The statute makes it illegal for a person who, knowing or in reckless disregard of the fact that an individual is an illegal alien, transports or moves, or attempts to transport or move, the alien "in furtherance of" the alien's illegal entry or continued illegal presence in the United States. Since the statute does not specifically define the term "in furtherance of," we must "construe it in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993); see United States v. Roberts, 88 F.3d 872, 877 (10th Cir. 1996) (if Congress does not define statutory term, "its

common and ordinary usage may be obtained by reference to a dictionary");

United States v. Floyd, 81 F.3d 1517, 1523 (10th Cir. 1996) ("In interpreting Congressional intent, a reviewing court must determine whether the language used in a statute is ambiguous, or whether it has an ordinary meaning."). Webster's defines "furtherance" as "a helping forward: advancement, promotion." Webster's Third International Dictionary 924 (1993). Similarly, Black's defines "furtherance" as the "[a]ct of furthering, helping forward, promotion, advancement, or progress." Black's Law Dictionary 675 (6th ed. 1990). In light of these definitions, we conclude the "in furtherance of" language is unambiguous. The statute requires that a defendant know or act in reckless disregard of the fact that an individual is an illegal alien, and that defendant's transportation or movement of the alien will help, advance, or promote the alien's illegal entry or continued illegal presence in the United States. [1]

Given our interpretation of the "in furtherance of" element, we reject the distinction recognized by the district court. Although we agree the element does

---

[1] In other settings, we have construed the term "in furtherance of" in a similar, broad manner. See, e.g., United States v. Sinclair, 109 F.3d 1527, 1534-35 (10th Cir. 1997) (concluding statements intended to promote conspiratorial objectives were made "in furtherance of" conspiracy and were thus admissible under Fed. R. Evid. 801(d)(2)(E)); United States v. McCullah, 76 F.3d 1087, 1102-03 (10th Cir. 1996) (discussing "in furtherance of" element of 21 U.S.C. § 848), cert. denied 117 S. Ct. 1699 (1997). Because the term is not ambiguous, "the rule of lenity--or strict construction--may not be applied." United States v. Oxx, 127 F.3d 1277, 1279 (10th Cir. 1997).

not encompass persons "'who come into daily contact with undocumented aliens and who, with no evil or criminal intent, intermingle with [illegal aliens] socially or otherwise,'" we do not agree that the element is limited solely to "those who support the presence of illegal aliens in this country through a smuggling operation or some other form of illicit transportation." Barajas-Chavez, 991 F. Supp. at 1291. Instead, we conclude the element is sufficiently broad to encompass any person who acts, regardless of profit motive or close relationship, with knowledge or with reckless disregard of the fact that the person transported is an illegal alien and that transportation or movement of the alien will help, advance, or promote the alien's illegal entry or continued illegal presence in the United States.

Before proceeding to determine whether the evidence presented at trial was sufficient to satisfy the "in furtherance of" element, we briefly consider how other circuits have dealt with the "in furtherance of" element. The Eighth Circuit and Ninth Circuit have adopted what the Ninth Circuit refers to as the "direct or substantial relationship" test for purposes of deciding whether the "in furtherance of" element has been satisfied. See, e.g., United States v. Velasquez-Cruz, 929 F.2d 420 (8th Cir. 1991); Moreno, 561 F.2d at 1323. Under this test, "there must be a direct or substantial relationship between [the defendant's] transportation [of the alien] and its furtherance of the alien's presence in the United States." Id.

Stated in contrary terms, the "in furtherance of" element is not satisfied if a defendant's transportation of an alien is "only incidentally connected to" the alien's illegal entry or continued illegal presence. Id. at 1322. Although neither circuit has provided precise guidelines for determining when a "direct or substantial relationship" exists, the Ninth Circuit has suggested relevant factors include the "time, place, distance and overall impact" of the transportation. Id. at 1323.

The Sixth Circuit has expressly rejected the "direct or substantial relationship" approach on the grounds it "is unable to distinguish between someone who knowingly smuggles illegal aliens across the country from someone who knowingly gives an illegal alien a ride to a shelter for the homeless." United States v. 1982 Ford Pick-Up, 873 F.2d 947, 951 (6th Cir. 1989). In its place, the Sixth Circuit has adopted what it describes as an "intent-based" approach, under which a factfinder is directed to consider all credible evidence concerning a defendant's intentions in transporting an illegal alien. As examples, the court has noted a factfinder may "look to see whether the defendant was compensated for the transportation," "what efforts the defendant took to conceal or harbor the illegal aliens," and "whether the illegal aliens were friends, co-workers, or companions of the defendant, or merely human cargo that was being shipped." Id.

The Fifth Circuit appears to have adopted a more general approach that

-8-

encompasses the "direct or substantial relationship" test, but also focuses on defendant's intent in transporting the alien. United States v. Merkt, 764 F.2d 266, 271-72 (5th Cir. 1985). With respect to the issue of intent, the court has stated a jury "should be instructed to consider all of the evidence it finds credible about [a defendant's] intentions" in moving or transporting the alien at issue. Id. at 272.

The Seventh Circuit has specifically refused to adopt either the "direct or substantial relationship" test or the "intent-based" approach. Parmalee, 42 F.3d at 391. Instead, the court has adopted a general approach that allows the government to prove the "in furtherance of" element "by reference to the facts and the circumstances surrounding [each particular] case." Id.

In light of our construction of the "in furtherance of" language, we reject the use of any particular "test" or "formula" for determining whether the "in furtherance of" requirement has been satisfied. Cf. United States v. Reyes, 798 F.2d 380, 384 (10th Cir. 1986) ("This Circuit has no talismanic formula for ascertaining when a conspirator's statements are 'in furtherance' of the conspiracy."). Instead, we believe the proper approach is a general one, similar to those espoused by the Fifth Circuit and the Seventh Circuit. Under such an approach, a factfinder may consider any and all relevant evidence bearing on the "in furtherance of" element (time, place, distance, reason for trip, overall impact

-9-

of trip, defendant's role in organizing and/or carrying out the trip). [2] Naturally, the relevant evidence will vary from case to case.

We now turn to the evidence in this case. Applying a de novo standard of review, we view the evidence, both direct and circumstantial, in the light most favorable to the government and, without weighing conflicting evidence or considering the credibility of witnesses, we determine whether that evidence, if believed, would establish the "in furtherance of" element. See United States v. Evans, 42 F.3d 586, 589 (10th Cir. 1994).

It is uncontroverted that defendant, having lost his job in Arizona because of his status as an illegal alien, planned, organized, and attempted to carry out a trip from Prescott, Arizona, to Denver, Colorado, so that he and the two illegal aliens he was charged with transporting could look for work. Although the

---

[2] We conclude the district court erred in focusing on only three factors (whether defendant received compensation for transportation, whether defendant took precautionary efforts to conceal the illegal aliens, and whether the illegal aliens were human cargo). Certainly, depending upon the facts of a particular case, all of these factors could be relevant in the "in furtherance of" inquiry. However, relying solely on these factors effectively limits the intended reach of the statute. In particular, it creates exceptions for cases involving transportation of illegal aliens who are friends or relatives of defendant, transportation not involving any profit motive, and transportation that is not furtive or concealed. Although it is not uncommon to find situations where a person furtively transports "human cargo" for profit, it is undoubtedly more common to find situations where a person transports an illegal alien who is also a friend or relative to enable the person to find work and/or to evade immigration authorities. The statute criminalizes both acts of transportation.

district court discounted this evidence, we believe it is sufficient, standing alone, to satisfy the "in furtherance of" element. In particular, we conclude defendant's transportation of the two illegal aliens would have advanced or promoted their continued illegal presence in the United States in two respects. First, the transportation would arguably have assisted the aliens in evading immigration authorities by relocating them to a city much farther from the United States-Mexico border. Second, the transportation was intended to assist them in finding employment. If their efforts had been successful, the benefits from finding employment undoubtedly would have assisted them in remaining in the United States. See generally United States v. Sanchez-Vargas, 878 F.2d 1163, 1169 (9th Cir. 1989) ("the transport offense was directed, in large part, at curbing the widespread practice of transporting illegal immigrants, already in the United States, to jobs and locations away from the border where immigration enforcement resources may have been more scarce").

We note in passing that the "in furtherance of" element is also supported by additional evidence. In carrying out the trip, defendant utilized a vehicle that is commonly associated with illegal transportation of aliens (a pickup with a camper shell with darkened windows). Both of the aliens, at least for part of the trip, rode inside the camper shell. Defendant was the sole driver of the pickup. He drove through the night and was stopped at the checkpoint during the early

-11-

morning hours.  Further, both aliens paid defendant to take them to Denver. [3]

The judgment of the district court is REVERSED and the case is REMANDED to the district court with instructions to reinstate the verdict of the jury.

---

[3] We emphasize that this additional evidence is not critical to our holding that the "in furtherance of" element was satisfied.  Indeed, even discounting all of this additional evidence, we would reach the same conclusion.

F I L E D
United States Court of Appeals
Tenth Circuit

JAN 28 1998

PATRICK FISHER
Clerk

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

MARTIN BARAJAS-CHAVEZ,

      Defendant - Appellee.

No. 97-2033

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-96-174-MV)**

John J. Kelly, United States Attorney, (Lauren A. Mickey, Assistant U.S. Attorney with him on the brief), Las Cruces, New Mexico, for Plaintiff - Appellant.

Floyd W. Lopez, Albuquerque, New Mexico, for Defendant - Appellee.

Before **PORFILIO**, **McKAY**, and **BRISCOE**, Circuit Judges.

**PORFILIO**, Circuit Judge.

      Martin Barajas-Chavez stood trial on charges of knowingly transporting two named undocumented aliens in furtherance of the aliens' illegal presence

within the United States, a violation of 8 U.S.C. § 1324(a)(1)(A)(ii).  At the end of the trial, Mr. Barajas-Chavez moved for judgment of acquittal, arguing there was insufficient evidence to show he acted "in furtherance of" his passengers' illegal presence within the United States.  The district court took Mr. Barajas-Chavez' motion under advisement and submitted the case to the jury.  The jury returned a guilty verdict, but the district court, acting on Mr. Barajas-Chavez' motion, set the verdict aside and entered a judgment of acquittal on the ground the evidence was insufficient to support the conviction.  The government appeals the district court's ruling.  We affirm.

I

Mr. Barajas-Chavez, an illegal alien, lost his job in the Arizona flagstone quarries following an immigration inspection and decided to go to Denver to look for work.[1]  As Mr. Barajas-Chavez discussed his plans with friends and acquaintances, others agreed to accompany him.  Arturo Lopez-Arrellano, one of Mr. Barajas-Chavez' relatives, wished to go to Denver and mentioned Jesus Macias-Lopez, an acquaintance, might also be interested.  Mr. Macias-Lopez knew Denver well and would be able to orient the group upon their arrival.  Mr. Barajas-Chavez approached Mr. Macias-Lopez and Mr. Macias-Lopez' brother in a hotel lobby and told them about his plans, and they expressed an interest in going.  When the group left Phoenix, it had swelled to eleven people: Mr.

---

[1]The following facts were abstracted from uncontested testimony presented at trial.  Where witness testimony is conflicting or subject to interpretation, we have identified the witness who provided the testimony.

Barajas-Chavez; Mr. Lopez-Arrellano; Mr. Macias-Lopez; Mr. Macias-Lopez' brother; Pedro and Maria Ramona and their two children; a female friend of the Ramonas; and two other, unnamed passengers.

In preparation for the journey, Mr. Barajas-Chavez purchased a camper shell at a yard sale for his pickup truck; some, but not all, of the camper shell's windows had been painted by a previous owner. Mr. Macias-Lopez gave Mr. Barajas-Chavez $150 for vehicle expenses on the trip. Mr. Lopez-Arrellano paid $50 to fill the pickup truck's gas tanks. Pedro Ramona gathered $250 for expenses from the other passengers. In all, the ten passengers gave Mr. Barajas-Chavez approximately $450.

The group set out from Phoenix bound for Denver. They stopped in Flagstaff for dinner, and the passengers moved freely about during this and other stops. At 3:00 a.m., police stopped Mr. Barajas-Chavez at a temporary roadblock on I-40 in McKinley County, New Mexico. At the roadblock, Joseph Garcia, an INS agent, asked Mr. Barajas-Chavez if he had any documentation showing he was in the United States legally. Mr. Barajas-Chavez admitted he was in the United States illegally and did not have any documentation. Agent Garcia saw a man and a woman in the cab with Mr. Barajas-Chavez, and, shining his flashlight into the camper shell, Garcia could see eight other people lying in the back of the truck. Agent Garcia questioned the passengers, each of whom admitted being undocumented. Garcia and other INS agents on the scene placed Mr. Barajas-Chavez and all the passengers under arrest. Mr. Barajas-Chavez was

eventually charged with the transportation of Mr. Macias-Lopez and Mr. Lopez-Arrellano in furtherance of their illegal presence within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

At trial, the government's case consisted of testimony from Mr. Macias-Lopez, Mr. Lopez-Arrellano,[2] and arresting agents Joseph Garcia and Steve Alba. Agents Garcia and Alba testified to the events surrounding the detection and arrest of Mr. Barajas-Chavez and his passengers. The agents said Mr. Barajas-Chavez told them he was charging his passengers $300 each for the transportation. Agent Garcia also observed, in his experience, alien smugglers frequently use camper shells with darkened windows to conceal their cargo and make their illegal passengers lie down to escape detection.

In his testimony, Mr. Lopez-Arrellano said he had initially told immigration officials he met Mr. Barajas-Chavez for the first time in Phoenix and paid $250 to be transported to Denver. Mr. Lopez-Arrellano admitted that these statements were untrue, that Mr. Barajas-Chavez was a relative, whom he had known for some time, and that he

---

[2]Agent Garcia testified Mr. Barajas-Chavez' passengers were interviewed for the purpose of enlisting them as material witnesses, but only Mr. Lopez-Arrellano and Mr. Macias-Lopez were deemed "credible." In exchange for their testimony, Mr. Lopez-Arrellano and Mr. Macias-Lopez received temporary social security cards and temporary work permits, valid through the end of Mr. Barajas-Chavez' trial. The other passengers were allowed to voluntarily return to Mexico.

had only given $50 to Mr. Barajas-Chavez for gas. The familial relationship was later confirmed by other witnesses.

At the end of the trial, defense counsel moved for a judgment of acquittal based on insufficiency of the evidence. The district court took the motion under advisement and submitted the case to the jury. The jury returned a guilty verdict. The district court subsequently set the verdict aside and entered a judgment of acquittal. In its order, the district court stated:

> In this case Defendant, Defendant's relative, and an acquaintance of Defendant's relative, were driving to Denver in search of employment. This was not a furtive transportation of undocumented aliens which inhibits government enforcement of immigration laws but was an act merely incidental to the aliens' presence here and is too attenuated to constitute a furtherance of their illegal presence. Specifically, the Court finds that the relationship between Defendant and the passengers, the fact that the transportation was not committed for profit, and the lack of furtiveness or concealment indicate this transportation was not "in furtherance" of the aliens' violation of law. The evidence, when viewed in the light most favorable to the Government, does not support the jury's verdict.

This appeal ensued.

## II

A district court decision setting aside a jury verdict and granting a judgment of acquittal is entitled to no deference on appeal, and we review it de novo. *United States v. Santistevan*, 39 F.3d 250, 255 (10th Cir. 1994). We must therefore view the direct and circumstantial evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable

- 5 -

doubt of each element of the crime. *Id.*; *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994); *United States v. Calloway*, 562 F.2d 615, 617 (10th Cir. 1977).

The statute upon which the government's case rests, 8 U.S.C. § 1324(a)(1)(A)(ii), provides "[a]ny person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law . . . shall be punished . . . ." Mr. Barajas-Chavez was charged with illegally transporting Mr. Macias-Lopez and Mr. Lopez-Arrellano. Evidence presented at trial clearly demonstrates Mr. Barajas-Chavez knew or had reason to know these two passengers were undocumented aliens and transported them from Arizona to New Mexico. The only issue in this appeal is whether the evidence presented at trial was sufficient to prove Mr. Barajas-Chavez conducted this transportation "in furtherance of" Mr. Macias-Lopez' and Mr. Lopez-Arrellano's illegal presence within the United States.

Section 1324 does not define the phrase "in furtherance of." However, courts seeking to define the phrase and evaluate the evidence required to prove the element have found it probative (1) the defendant profited from the transportation; (2) the defendant actively attempted to conceal the passengers; and (3) the passengers were mere "human cargo" (i.e., the passengers were not related to the defendant by blood, friendship, or acquaintance and their movements were guided, dictated, or controlled by

the defendant during the transportation). *See*, *e.g.*, ***United States v. Parmelee***, 42 F.3d 387, 391 (7th Cir. 1994) (discussing evidence relevant to an "in furtherance of" inquiry); ***United States v. 1982 Ford Pick-Up***, 873 F.2d 947, 951 (6th Cir. 1989) (same). In general, the central object of inquiry is the defendant's purpose in conducting the transportation, rather than the transportation's logical result or effect. *See **United States v. Chavez-Palacios***, 30 F.3d 1290, 1294 (10th Cir. 1994) (holding legally sufficient evidence existed to support the jury's conclusion "defendant had the intent to further the aliens' presence" in the United States); ***United States v. Perez-Gomez***, 638 F.2d 215, 218-19 (10th Cir. 1981) (holding evidence "amply demonstrate[d] [the defendant's] concern that the aliens be kept secreted to avoid suspicion"); ***United States v. Salinas-Calderon***, 585 F. Supp. 599, 602 (D. Kan. 1984) (holding the government "failed to prove beyond a reasonable doubt that the defendant acted in willful furtherance of the aliens' illegal presence in the United States").

The paradigmatic conduct proscribed by the statute is well-represented by ***United States v. Perez-Gomez***, 638 F.2d 215, 218 (10th Cir. 1981), in which the defendant attempted to transport nineteen undocumented aliens in a van from Los Angeles to Chicago. In ***Perez-Gomez***, the alien passengers had crossed the United States border illegally only days before the transportation, and the defendant made all the arrangements for food and accommodations during the trip. ***Id.*** The defendant had not met any of the passengers before transporting them, and none of the aliens even knew the defendant's

name until the arresting officers mentioned it.  *Id.*  A partition had been placed between the driver and the cargo area of the van, concealing the passengers; and before setting out for Chicago, the defendant led the passengers two at a time from a hotel room, locking each pair inside the van before returning to the room to escort another.  *Id.* After the trip began, the nineteen passengers were confined in the back of the van for twenty-eight hours without an opportunity to eat or leave.  *Id.*  Cases like *Perez-Gomez* fit squarely within the prohibition of the statute.

At the other end of the spectrum lie cases like *United States v. Salinas-Calderon*, 585 F. Supp. 599 (D. Kan. 1984), in which the defendant set out to transport six undocumented aliens in a pickup truck from Colorado to Florida:

> Mr. Salinas-Calderon knew his passengers for about four months prior to their trip, . . . they worked together, and . . . they were on friendly terms with each other.  The defendant and the aliens individually planned to go to Florida; the defendant planned to drive his family in their pickup, and he agreed to give his coworkers a ride.  They shared the expense of the trip; the defendant was not compensated in any way.  The vehicle was not specially designed to conceal the passengers, and there was no attempt to conceal or harbor the passengers.

585 F. Supp. at 602.  Cases like *Salinas-Calderon*, in which the defendant and the passengers are friends, family, or acquaintances simply pooling their resources during travel, fail to demonstrate an intent to transport undocumented aliens "in furtherance of" their unlawful presence within the United States and therefore fall outside the range of activities prohibited by the transportation statute.

- 8 -

The district court, relying in part on ***Salinas-Calderon***, ruled the evidence presented at Mr. Barajas-Chavez' trial was insufficient to show the transportation of the two aliens named in this case was "in furtherance of" the aliens' violation of the law. In reaching this conclusion, the district court found (1) Mr. Barajas-Chavez did not receive compensation for transporting the named undocumented aliens, (2) Mr. Barajas-Chavez made no attempt to conceal his passengers, and (3) the relationship between Mr. Barajas-Chavez and the named passengers refuted any inference the passengers were "human cargo." The government maintains the district court's conclusions are unsupported by the record, the opposite conclusions are supported by the record, and the jury's verdict is therefore valid. In addition, the government contends, even if the record does support the district court's factual findings, evidence presented at trial showing Mr. Barajas-Chavez knowingly transported the named undocumented aliens a substantial distance for the purpose of seeking employment proves the "in furtherance of" element and supports the jury's verdict. We consider each of these arguments in turn.

### A. The district court's factual findings.

The government claims the evidence presented at trial was sufficient for a reasonable jury to find: (1) Mr. Barajas-Chavez intended to charge each of his passengers $300 for their transportation and therefore intended to profit from the transportation; (2) Mr. Barajas-Chavez attempted to conceal the passengers during the

- 9 -

journey by purchasing a camper top with darkened windows for the pickup truck and having the passengers lie down in the bed of the truck; and (3) Mr. Barajas-Chavez did not know the majority of his passengers, indicating his passengers were mere "human cargo." The jury's ability to reach these conclusions from the evidence presented at trial, the government argues, adequately supports the "in furtherance of" element of the transportation charge, and therefore renders the district court's judgment of acquittal invalid.

The testimony of Agents Garcia and Alba, the government argues, shows Mr. Barajas-Chavez intended to profit from the transportation. Agent Garcia testified Mr. Barajas-Chavez "had $360 that he had collected from [the passengers], or $300 that he was going to charge." Agent Alba testified Mr. Barajas-Chavez told him "he was transporting [the illegal aliens] to the Denver, Colorado, area, and that he was charging them a fee of approximately $300 per person." These statements, even if accepted as true, do not indicate whether Mr. Lopez-Arrellano or Mr. Macias-Lopez, the aliens actually named in the indictment, were among those persons being charged for the transportation. The alleged statements do not indicate *all* of the truck's occupants were to be charged, and no specific evidence indicating Mr. Lopez-Arrellano or Mr. Macias-Lopez were "charged" anything for the trip was presented at trial. However, the evidence in the record does show Mr. Lopez-Arrellano and Mr. Macias-Lopez agreed to "chip in" for the expenses of the trip. Mr. Lopez-Arrellano testified he spent $50 to fill

- 10 -

the gasoline tanks of the pickup truck, and Mr. Macias-Lopez testified he agreed to pay $150 toward vehicle expenses for the trip. This evidence indicates the financial arrangements between Mr. Barajas-Chavez, Mr. Macias-Lopez, and Mr. Lopez-Arrellano were cooperative. The record therefore does not support the conclusion Mr. Barajas-Chavez intended to profit from transporting Mr. Macias-Lopez and Mr. Lopez-Arrellano.

The government claims the darkened windows of the camper shell and the passengers' reclining position in the pickup bed indicate Mr. Barajas-Chavez intended to conceal the undocumented aliens during their transportation. Assuming the relevance of the evidence where the indictment charges transportation of only two aliens, the inference is not tenable in light of other evidence presented at trial. Some of the camper shell's windows were unpainted, and Agent Garcia could see the passengers simply by looking through a window with his flashlight. Mr. Barajas-Chavez did not paint the windows of the camper shell himself; they had been painted before he purchased the shell, and yet no effort was made to darken the remaining windows. During the trip, many of the passengers, including Mr. Lopez-Arrellano, sat in the cab with Mr. Barajas-Chavez, in plain view of persons outside the truck. During stops for food and gas, the passengers did not behave in a furtive manner, and Mr. Barajas-Chavez and the other passengers made no effort to conceal their undocumented status when questioned by Agents Garcia and Alba. Although the passengers were lying down when the truck entered the roadblock, there is nothing unusual about passengers lying down at 3:00 a.m.

- 11 -

on a long road trip. The only evidence supporting an inference of concealment, therefore, is Agent Garcia's testimony that, in his experience, darkened windows and reclining passengers are indicative of an alien smuggler's attempt to conceal his cargo. No reasonable trier of fact could conclude from the evidence presented at trial Mr. Barajas-Chavez intended to conceal his passengers.

The government claims Mr. Macias-Lopez was a stranger to Mr. Barajas-Chavez prior to the transportation and submits the lack of prior relationship indicates Mr. Macias-Lopez was "human cargo." However, knowing a person for only a short time before transporting him or her does not by itself indicate the person is a defendant's "human cargo;" something more is required. The trial testimony shows Mr. Macias-Lopez was Mr. Lopez-Arrellano's acquaintance and Mr. Barajas-Chavez approached Mr. Macias-Lopez on his relative's suggestion. Mr. Barajas-Chavez did not curtail, control, or dictate Mr. Macias-Lopez' movements during the trip. No reasonable trier of fact could conclude from this evidence Mr. Macias-Lopez was "human cargo."

The evidence in the record does not show Mr. Barajas-Chavez profited or intended to profit from transporting Mr. Lopez-Arrellano or Mr. Macias-Lopez. Nor does the evidence show Mr. Barajas-Chavez sought to conceal Mr. Lopez-Arrellano or Mr. Macias-Lopez, either by ordering them to remain concealed in the camper or by purposefully darkening the camper shell windows in preparation for the trip. Finally, the evidence indicates Mr. Lopez-Arrellano and Mr. Macias-Lopez were not human cargo,

- 12 -

but rather Mr. Barajas-Chavez' relative and acquaintance. We therefore find no error in the district court's factual findings.

### B. Transportation a substantial distance for the purposes of seeking employment.

The government contends, even if the district court's factual findings are not in error, the jury verdict is nonetheless supported by the evidence. The government claims the prosecution established the "in furtherance of" element of 8 U.S.C. § 1324(a)(1)(A)(ii) by showing Mr. Barajas-Chavez knowingly transported undocumented aliens a substantial distance for the purpose of seeking employment. Employment within the United States, the government argues, is an undocumented alien's "life-line" to this country and enables the alien to obtain food, shelter, and other necessities, thereby permitting the undocumented alien to maintain his or her illegal presence within the United States. When a defendant transports an undocumented alien to a place in which the alien can seek employment, the government contends, the defendant necessarily "furthers" the alien's illegal presence. Under this theory, the government has presented sufficient evidence to support the "in furtherance of" element of the conviction by demonstrating Mr. Barajas-Chavez transported Mr. Macias-Lopez and Mr. Lopez-Arrellano from Arizona to New Mexico for the purpose of seeking employment in Denver.

The majority of courts interpreting § 1324(a)'s "in furtherance of" language have rejected the reasoning the government urges here. Transportation of an undocumented alien simply for the purpose of seeking or enabling employment is not, by itself, prohibited by the statute. *See 1982 Ford Pick-Up*, 873 F.2d at 952 (reversing forfeiture of vehicle because defendant merely transported aliens for purpose of seeking employment, a showing which was insufficient to prove the "in furtherance of" element of the transportation charge); *United States v. Moreno*, 561 F.2d 1321, 1322 (9th Cir. 1977) (holding transportation of illegal aliens during the ordinary and required course of the defendant's employment "was only incidentally connected to the furtherance of the [aliens'] violation of law, if at all"); *United States v. Moreno-Duque*, 718 F. Supp. 254, 259 (D. Vt. 1989) (concluding the transportation statute requires "more than mere knowing employment and employment-related transportation of illegal aliens to satisfy all of its essential elements"); *United States v. One 1982 Toyota SR 5 Pick-Up Truck*, 642 F. Supp. 335, 338 (N.D. Ill. 1986) (rejecting the "government's position that all transportation in the employment context of known and undocumented aliens is in furtherance of their unlawful presence within the meaning of [the transportation statute]"); *Salinas-Calderon*, 585 F. Supp. at 602-03 (rejecting argument that a defendant's transportation of illegal aliens to an area where the aliens might obtain employment could, by itself, satisfy the "in furtherance of" element of the transportation charge). Furthermore, the government's focus on the possible *effect* of the defendant's

- 14 -

transportation--the prospective employment of the defendant's passengers and the potential for resulting sustenance--is misplaced given § 1324's focus on the defendant's *intent* in conducting the transportation. *See*, *e.g.*, *1982 Ford Pick-Up*, 873 F.2d at 951 ("To be found guilty of violating [the transportation statute] the government must prove that the defendant transported an alien with the purpose of supporting or promoting his or her illegal presence."); *Moreno-Duque*, 718 F. Supp. at 259 ("In other words, the government must prove that the defendants specifically intended by means of the transportation to advance or assist the alien's violation of law, not merely that the effect of the transportation was to allow the alien to remain in the United States."). We hold therefore, the government cannot meet its burden to prove a defendant's transportation of an illegal alien is in furtherance of that alien's illegal presence within the United States simply by showing the defendant has transported the alien a substantial distance for the purpose of seeking employment. Because no reasonable trier of fact could conclude from the evidence on record that Mr. Barajas-Chavez' transportation of the undocumented aliens named in this case was conducted "in furtherance of" those aliens' illegal presence within the United States, we **AFFIRM** the district court's judgment of acquittal.

No. 97-2033, United States v. Barajas-Chavez

BRISCOE, Circuit Judge, dissenting:

I respectfully dissent. The outcome of this case is controlled by the applicable scope of review. A district court's decision setting aside a jury verdict is entitled to no deference. United States v. Santistevan, 39 F.3d 250, 254 (10th Cir. 1994). This court reviews a district court's grant of a motion for acquittal de novo. United States v. Evans, 42 F.3d 586, 589 (10th Cir. 1994). Specifically, this court views the evidence, both direct and circumstantial, in the light most favorable to the government and, without weighing conflicting evidence or considering the credibility of witnesses, determines whether that evidence, if believed, would establish each element of the crime. Id. If the government has met that standard, this court, as well as the district court, must defer to the jury's verdict of guilty. Id. While the majority cites the correct scope of review, it, like the district court, ignores the applicable scope of review and views the evidence in the light most favorable to defendant. The evidence presented at trial is clearly sufficient, when viewed in the light most favorable to the government, to support defendant's convictions for transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). I would reverse the district court's judgment of acquittal and remand with directions to reinstate the jury's verdict.

# I.

Before applying the applicable scope of review, we must first determine what the government must prove to satisfy the "in furtherance of" element of the statute. The statute under which defendant was charged, 8 U.S.C. § 1324(a)(1)(A)(ii), makes it illegal for any person who

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

The statute was not intended to criminalize purely innocent conduct, such as, for example, "the actions of a cab driver who transports in a routine commercial transaction an individual who announces his illegal alien status during the course of the ride." United States v. Parmelee, 42 F.3d 387, 391 (7th Cir. 1994). Rather, "the transport offense was directed, in large part, at curbing the widespread practice of transporting illegal immigrants, already in the United States, to jobs and locations away from the border where immigration enforcement resources may have been more scarce." United States v. Sanchez-Vargas, 878 F.2d 1163, 1169 (9th Cir. 1989) (analyzing legislative history of statute).

To establish a violation of § 1324(a)(1)(A)(ii), the government must establish "(1) the transporting or moving of an alien within the United States, (2) that the alien was present in violation of law, (3) that the defendant was aware of

the alien's status, and (4) that the defendant acted willfully in furtherance of the alien's violation of the law." United States v. Diaz, 936 F.2d 786, 788 (5th Cir. 1991) (listing elements for violation of § 1324(a)(1)(B), the predecessor statute to § 1324(a)(1)(A)(ii)); see United States v. Hernandez, 913 F.2d 568, 569 (8th Cir. 1990) (same); see also Parmelee, 42 F.3d at 391 ("a defendant's guilty knowledge that his transportation activity furthers an alien's illegal presence in the United States is an essential element of the crime"). Only the final element is at issue in this appeal. Currently, there is disagreement among the circuits concerning how to interpret this final element, and three different approaches have been utilized.

**Direct or substantial relationship approach**

The first approach was adopted by the Ninth Circuit in United States v. Moreno, 561 F.2d 1321 (9th Cir. 1977), in which a foreman for a reforestation company who transported workers from one job site to another was charged with violating 8 U.S.C. § 1324(a)(2) (a predecessor statute to § 1324(a)(1)(A)(ii)). Noting the defendant's employment required him to transport the workers, the Ninth Circuit concluded the transportation "was only incidentally connected to the furtherance of the violation of law, if at all." Id. at 1322. In order to satisfy the "in furtherance of" element, the court held, "there must be a direct or substantial relationship between that transportation and its furtherance of the alien's presence in the United States." Id. at 1323. Although the Moreno court provided little

guidance in how to determine when such a relationship exists, it did suggest factors such as the transportation's "time, place, distance and overall impact" are relevant. Id.; see also United States v. One 1984 Ford Van, 826 F.2d 918, 919-20 (9th Cir. 1987) (applying Moreno and holding "[t]ransportation at remote jobsites" does not violate the statute).

Some courts that have subsequently adopted the "direct or substantial relationship" approach have indicated an alternative way of describing it is that the transportation of an illegal alien does not violate § 1324(a)(1)(A)(ii) if the transportation is only incidentally connected to furtherance of an alien's violation of the law. See, e.g., United States v. Velasquez-Cruz, 929 F.2d 420 (8th Cir. 1991). In Velasquez-Cruz, the defendant was an illegal alien who had applied for amnesty from the government. While in Los Angeles, defendant met six illegal aliens from Ecuador who, like defendant, were interested in moving to New York. The aliens pooled their money to buy a used car and a van and set out for New York. While defendant was driving the car through Arkansas, with some of the other aliens as passengers, she was stopped and eventually arrested for illegal alienage. Defendant was subsequently charged and convicted of willfully transporting aliens in violation of § 1324(a)(1)(B) (a predecessor statute). On appeal, defendant argued the evidence presented at trial was insufficient to demonstrate that she acted in furtherance of the aliens' violation of the law. In

particular, defendant argued "her transportation of illegal aliens was merely incidental to her own journey to New York, because she did not instigate the aliens' plan to move or persuade them to do so, did not seek to conceal the aliens, did not sell the car or receive the money for its sale, and shared the driving with other aliens." Id. at 424. The Eighth Circuit rejected defendant's arguments and concluded there was sufficient evidence to support her conviction. Specifically, the court noted there was substantial evidence to support the conclusion that defendant organized the aliens' journey (e.g., by playing a key role in buying the car, by directing at least some of the aliens to meet her at a safe house to begin the journey, and by being the sole or at least primary driver of the car). Id.

### Intent-based approach

The Sixth Circuit has expressly rejected the "direct or substantial relationship" approach on the grounds that it "is unable to distinguish between someone who knowingly smuggles illegal aliens across the country from someone who knowingly gives an illegal alien a ride to a shelter for the homeless." United States v. 1982 Ford Pick-Up, 873 F.2d 947, 951 (6th Cir. 1989). In its place, the Sixth Circuit adopted an "intent-based" approach which purportedly focuses on the intent of the person accused of transporting illegal aliens. Under this approach, the fact finder is directed to consider all evidence it finds credible about the defendant's intentions. As examples, the Sixth Circuit noted a fact

-5-

finder may "look to see whether the defendant was compensated for the transportation," "what efforts the defendant took to conceal or harbor the illegal aliens," and "whether the illegal aliens were friends, co-workers, or companions of the defendant, or merely human cargo that was being shipped." Id.

In 1982 Ford, two pickup trucks owned by Juana and Luis Mendoza were seized by INS because of alleged use in transporting illegal aliens in violation of § 1324(a)(1)(B). More specifically, it was uncontroverted the Mendozas had used the trucks to transport citizens of El Salvador, all of whom were friends, relatives, and former co-workers of the Mendozas, from Dallas, Texas, to Covington, Kentucky, for the admitted purpose of helping them obtain construction jobs (Luis Mendoza owned a construction company and had relocated it from Dallas to Covington). Purportedly applying its intent-based approach, a divided panel concluded "that the Mendozas' actions were quite innocent." Id. at 952. More specifically, the two members of the majority noted (1) the Mendozas made no attempt to hide their passengers or otherwise conceal the fact they were illegal aliens, (2) the Mendozas received no financial remuneration for their actions, (3) the illegal aliens were friends, relatives, and co-workers of the Mendozas, (4) the aliens sought transportation to Kentucky to find employment and not to escape prosecution or otherwise evade the law, and (5) the Mendozas' purpose "was to

promote the well-being of friends and relatives by helping them obtain

employment." Id.[3]

### General approaches

The Fifth Circuit appears to have implicitly adopted a more general

approach that utilizes the Ninth Circuit's "direct or substantial relationship"

approach, but also focuses on the intent of the defendant in transporting aliens.[4]

United States v. Merkt, 764 F.2d 266, 271-72 (5th Cir. 1985).  In determining the

defendant's intent, the Fifth Circuit has stated a jury "should be instructed to

consider all of the evidence it finds credible about [a defendant's] intentions,

direct as well as circumstantial, such as the mode of transportation used, the time

of travel, the route chosen, . . . and the distance from the border at the time of

apprehension." Id. at 272.

In Parmelee, the Seventh Circuit acknowledged both the "direct or

substantial relationship" and "intent-based" approaches, but refused to adopt

---

[3]  The remaining panel member in      1982 Ford  filed a dissenting opinion
which I find, at least in part, more persuasive than the majority opinion.  In
particular, the dissent criticized the majority's application of the intent-based
approach, noting that by transporting the aliens to Kentucky for purposes of
obtaining construction jobs, the "defendants clearly intended to further the aliens'
illegal presence."  873 F.2d at 952.

[4]  Although the Sixth Circuit in      One Ford Pick-Up   stated the Fifth Circuit
in Merkt had utilized only an intent-based approach, this is incorrect.  The Fifth
Circuit expressly acknowledged and relied on the Ninth Circuit's direct or
substantial relationship approach as well.  764 F.2d at 271-72.

either for purposes of determining a defendant's guilty knowledge that his transportation activity furthers an alien's illegal presence in the United States. 42 F.3d at 391. In doing so, the Seventh Circuit stated:

> As in other criminal prosecutions that require mens rea, the government may prove the defendant's knowledge by reference to the facts and the circumstances surrounding the case. Relevant considerations bearing on this issue include whether the defendant received compensation for his transportation activity, whether the defendant took precautionary efforts to conceal the illegal aliens, and whether the illegal aliens were the defendant's friends or co-workers or merely human cargo.

Id.[5] (internal citations omitted).

## Tenth Circuit approach

This court has never expressly adopted or rejected any of the above-listed approaches for determining the "in furtherance of" element. It has, however, previously discussed the element on two separate occasions. In United States v. Perez-Gomez, 638 F.2d 215 (10th Cir. 1981), the defendant was arrested in Hays, Kansas, after INS agents (who had been advised defendant was transporting illegal aliens from Los Angeles to Chicago) observed him walk from a motel room to a nearby restaurant, order thirty-two hamburgers and sixteen orders of

---

[5] I do not read the "relevant considerations" listed by the Seventh Circuit as exclusive determinatives of guilty knowledge. Surely, a defendant can intend to further an illegal alien's presence in this country even though he or she receives no money for doing so, is a friend or relative of the alien's, and takes little or no precautionary efforts to conceal the alien during transportation.

fries to go, return with the food to two motel rooms, and later escort nineteen people from the rooms to a van parked nearby. After being charged and convicted of transporting illegal aliens, defendant appealed and contended the evidence presented at trial was insufficient to establish the transportation was in furtherance of the aliens' illegal presence. In rejecting this argument, the court cited Moreno and held "the transportation of [nineteen] aliens from Los Angeles to Kansas, en route to Chicago, sufficiently further[ed] the aliens' illegal presence in the United States to meet the requirements of the statute." Id. at 219. Although the court mentioned other factors (e.g., the aliens had crossed the border within days of their cross-country journey, none of the aliens knew defendant's name, the aliens were transported from Los Angeles to Hays without an opportunity to eat or leave the van, and the van had a special partition to prevent outsiders from observing the cargo), it is unclear whether the court considered those factors relevant to the "in furtherance of" element, to defendant's knowledge that his passengers were illegal aliens (an element which the defendant also challenged on appeal), or to both. Id.

Thirteen years later, in United States v. Chavez-Palacio, 30 F.3d 1290, 1294 (10th Cir. 1994), this court again acknowledged Moreno in noting "that mere transportation of an illegal alien is, without more, insufficient as a matter of law to support a conviction under this statute." In Chavez-Palacio, this court held

the "in furtherance of" requirement was satisfied where the defendant was driving a van in New Mexico, en route to Denver, carrying several illegal aliens "so that the aliens could attempt to find work there." Id. Although the court noted the aliens were lying down in the rear of the van when it was stopped by authorities, there is no mention of any additional factors (e.g., defendant's receipt of money for transporting aliens, whether defendant knew the aliens, etc.).

Reviewing these two cases together, I believe this court has implicitly adopted a general approach, similar to that of the Fifth or Seventh Circuits. Although the court has expressly cited the Ninth Circuit's "direct or substantial" relationship test, it has also implicitly approved of a jury considering all credible evidence concerning the defendant's intentions.

## The majority's approach

Unfortunately, the majority erroneously suggests only three factors (i.e., profit, active concealment, and "human cargo") are relevant in determining whether transportation occurred "in furtherance of" an illegal alien's presence within the United States. Not only does this approach ignore circuit precedent, it effectively limits the intended reach of the statute, and ignores the very problems to which the statute was intended to respond. Although it is obviously not uncommon to find situations (such as Perez-Gomez) in which a person is simply transporting illegal aliens to make a profit, it is undoubtedly more common to find

-10-

situations in which a person agrees to transport an acquaintance, friend, or relative who is an illegal alien to other parts of the country to enable that person to find work and/or evade immigration authorities. In the latter situation, the transporter has as much, if not more, of an intent to further the illegal alien's presence in this country than does the transporter in the former situation. Because of this greater personal interest, it is likely the transporter in the latter situation will be willing to do so without pay. For these reasons, I believe the general approach, which allows the fact finder to consider any and all relevant evidence of intent (e.g., time, place, distance, reason for trip, overall impact of trip, defendant's role in organizing and/or carrying out the trip, etc.), is the proper one.

## II.

At trial, the government presented the testimony of various witnesses, including two INS agents, Joseph Garcia and Steve Abla, who interviewed defendant after his arrest, and the two illegal aliens defendant was charged with transporting, Arturo Lopez-Arellano and Jesus Macias-Lopez. Defendant testified on his own behalf, and also presented the testimony of two relatives. Not surprisingly, the jury was ultimately faced with conflicting evidence about what transpired.

-11-

Garcia testified the truck defendant was driving had a camper shell with windows that had been painted dark, and, in his experience, older trucks with camper shells were used extensively for alien smuggling. Garcia further testified such camper shells usually have darkened or curtained windows to hide the illegal aliens. Both Garcia and Abla, who worked with Garcia at the checkpoint, testified defendant waived his rights after the arrest and told them he was charging the other people in the truck approximately $300 per person to transport them to Denver. When the truck was stopped, another man and a woman were in the cab with defendant, and eight people (men, women, and children) were lying in the back of the truck. All of the occupants were determined to be illegal aliens. According to Abla, defendant stated he had met the illegal aliens at a motel in the Phoenix area.

Lopez-Arellano testified defendant was a friend of his, and was also his brother-in-law's brother-in-law. According to Lopez-Arellano, both he and defendant had been fired from their employment for not having papers and, after discussing the situation, they decided to travel to either Denver or Oregon to find work. Shortly thereafter, defendant traveled to Phoenix and, upon his return, told Lopez-Arellano it would be better if they traveled to Denver. Lopez testified defendant offered to drive his truck to Denver and, in return, Lopez-Arellano agreed to pay for gasoline. Lopez-Arellano further testified he and defendant left

-12-

Prescott, Arizona (where Lopez-Arellano was living) in defendant's truck and drove to Phoenix. At Phoenix, defendant drove to a house or hotel, went inside, and returned with the other people (most of whom Lopez-Arellano did not know), who got into the truck. According to Lopez-Arellano, they refueled and continued driving toward Denver. At Flagstaff, Arizona, they stopped to eat at a fast-food restaurant, and then continued until they reached the checkpoint where they were stopped. Lopez-Arellano testified he had initially lied to INS agents and told them he paid $300 to be smuggled into the United States and paid defendant $250 for the trip to Denver. Lopez-Arellano further testified he told the government the "truth" on the day prior to trial.

Macias-Lopez testified he walked across the Mexico-United States border at Del Monte, caught a ride with someone, and eventually took a taxi to a hotel in Phoenix. Macias-Lopez testified he arrived at the hotel early on a Friday morning. He subsequently met and talked to defendant in the lobby of the hotel. Defendant asked if Macias-Lopez and his brother (it is unclear whether Macias-Lopez traveled with his brother across the border or simply met his brother at the hotel) wanted to go to Denver, and asked if Macias-Lopez had any money. Macias-Lopez testified he gave defendant $150 to buy a vehicle (Macias-Lopez' testimony on this point is unclear), and that his brother gave defendant money for the trip as well. Macias-Lopez testified he had never met defendant prior to the

trip, and did not know anyone in the pickup other than his brother (with the exception of Lopez-Arellano whom he allegedly encountered in a park in Prescott, Arizona, on the Friday afternoon after he arrived at the hotel). Macias-Lopez' description of the trip at trial was the same as the description he gave to Garcia at the time he was arrested.

Defendant testified he was born in Mexico and entered the United States illegally in 1983. Since that time he has lived and worked in different locations in Arizona and Oregon. In December 1995, he was working in Arizona when he lost his job due to his illegal alien status. He contemplated returning to Oregon to find work. However, he talked with some friends in Phoenix about his situation and a man named Pedro Ramona told him there were good opportunities in Denver. Defendant testified that he agreed to take Ramona and his family (wife and two children) to Denver in return for them finding defendant a place to stay until he found work. Defendant testified that when he later told Lopez-Arellano about his plan to go to Denver, Lopez-Arellano expressed interest in going as well, and wanted to take along two friends who were familiar with Denver and could help them find work. Defendant testified that on the day of the trip, he picked up Lopez-Arellano and the two Macias-Lopez brothers in Prescott, Arizona, then drove to Phoenix where he picked up Ramona and his family at their apartment. At Ramona's apartment, Ramona told defendant there were three

more people who wanted to go to Denver. Defendant agreed to allow the three additional people to ride with them. Defendant testified they refueled and ate in Flagstaff before continuing to the checkpoint. According to defendant, he received a total of $150 from Lopez-Arellano and the two Macias-Lopez brothers in Prescott, and a total of $250 from the other people in the truck who loaded in Phoenix. Defendant testified that at the time of his arrest, he had approximately $500 in cash (which included $140 of his own which he took with him when he left).

Viewing the evidence in the light most favorable to the government, I conclude it is more than sufficient to satisfy the "in furtherance of" element with respect to defendant's transportation of both Lopez-Arellano and Macias-Lopez. It is uncontroverted that defendant planned and organized the trip to Denver, a city much farther away from the Mexico-United States border than Prescott or Phoenix, so that he, Lopez-Arellano, and Macias-Lopez could look for work. It is further uncontroverted that in carrying out the trip, defendant utilized a vehicle commonly associated with the illegal transportation of illegal aliens, i.e., a pickup truck and a camper shell with darkened windows. It is uncontroverted that the majority of the aliens (including Macias-Lopez and, for part of the trip, Lopez-Arellano) rode inside the camper shell and were lying down at the time the truck reached the checkpoint. It is also uncontroverted that defendant was driving

-15-

through the night and was stopped at the checkpoint in the early morning hours. All of these basic facts, viewed in the light most favorable to the government, suggest defendant was acting in willful furtherance of Lopez-Arellano's and Macias-Lopez' illegal presence in this country.

With respect to Lopez-Arellano specifically, the only controverted fact of importance is whether Lopez-Arellano paid defendant to take him to Denver, or whether Lopez-Arellano merely paid for gas when they refueled the pickup in Flagstaff. Viewing the evidence in the light most favorable to the government, the jury could have reasonably believed Lopez-Arellano was lying at trial and had actually paid defendant for the trip. Both agent Garcia and agent Abla testified defendant told them he was charging $300 per person to transport the truck's occupants to Denver. Although Lopez-Arellano was a friend of the defendant, this does not necessarily preclude a finding that defendant acted in furtherance of Lopez' illegal presence in this country.

With respect to Macias-Lopez, it is controverted whether he began riding with defendant in Prescott, Arizona, or whether he met defendant at a motel in Phoenix and agreed to pay him for a ride to Denver. Viewing the evidence in the light most favorable to the government, the jury could have reasonably believed the latter story. Either way, it is uncontroverted that Macias-Lopez paid defendant some amount of money for the ride. Further, it is uncontroverted that

Macias-Lopez was, at best, a mere acquaintance of defendant. Thus, the jury could have reasonably concluded Macias-Lopez was "human cargo."

In the end, the facts of this case fall somewhere between those of Perez-Gomez and Chavez-Palacio. Specifically, the facts are arguably less egregious than Perez-Gomez because defendant knew one of the aliens (Lopez-Arellano), and because he did not keep the aliens locked up in his vehicle for long periods of time without food, water, or bathroom breaks. However, the facts are arguably more egregious than Chavez-Palacio in that defendant received money from the aliens (one of whom was not his friend or co-worker) for transporting them to Denver (in Chavez-Palacio, it is unclear whether the defendant received any money, or whether the defendant knew the people he was transporting). Accordingly, it is entirely consistent with circuit precedent to conclude there was sufficient evidence to support defendant's convictions.

Even if we were to believe defendant's version of the facts, the evidence would still demonstrate that he was an "organizer" of the trip, and thus acted "in furtherance of" the other aliens' presence in this country, consistent with the Eighth Circuit's holding in Velasquez-Cruz. Specifically, defendant researched two possible destinations (Oregon and Denver) and determined Denver would have the best employment opportunities for himself and the other aliens. Further, defendant offered to use his truck to transport everyone from Arizona to Denver.

-17-

In return, defendant received compensation in various forms (e.g., cash from some of the aliens, payment for gas from others, and payment in the form of a place to live).  Finally, defendant was the sole driver of the truck.

In reversing defendant's convictions, the district court essentially viewed the evidence in the light most favorable to the defendant.  For example, the district court concluded Lopez-Arellano contributed only $50 for gasoline, and did not otherwise pay defendant for the trip.  Further, the district court acknowledged Macias-Lopez paid defendant $150 for the trip, but nevertheless concluded defendant did not profit from this because defendant's transportation expenses included "insurance, licensing, taxes, oil, gasoline and wear and tear on the vehicle."  District Court's Opinion at 5.  The district court also acknowledged the camper shell windows were darkened, but nevertheless concluded there was no concealment or harboring, in part because the camper windows were darkened when defendant purchased the camper.  Finally, the court concluded Macias-Lopez was not human cargo because he was an acquaintance of Lopez-Arellano.  Unfortunately, the majority does the very same thing in affirming the district court's decision.[6]

_____

[6] Although the majority initially cites the proper de novo standard of review, it proceeds in section II.A. of the opinion to determine whether the district court's "factual findings" were in "error."  Clearly, there are no "factual findings" to review in this case, nor is the district court's view of the evidence

(continued...)

-18-

## III.

For the reasons outlined above, I would reverse the district court's

judgment of acquittal and remand with directions to reinstate the jury's verdict.

---

[6](...continued)
entitled to any deference. Rather, our role on appeal is to view the evidence in
the light most favorable to the government and determine whether the jury could
have reasonably found the "in furtherance of" element.