**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Leonard W. EVANS, Defendant–Appellee.**

**No. 93–2051.**

United States Court of Appeals,
Tenth Circuit.

Dec. 5, 1994.

John J. Kelly, U.S. Atty. (Robert J. Gorence, Asst. U.S. Atty., with him on the brief), Albuquerque, NM, for plaintiff/appellant.

Glen L. Houston, Hobbs, NM, for defendant/appellee.

Before SEYMOUR, Chief Judge, McKAY, and BALDOCK, Circuit Judges.

SEYMOUR, Chief Judge.

The government appeals the district court's judgment of acquittal and alternative grant of a new trial after a jury found Defendant Leonard W. Evans guilty on all fifteen counts before it. Eight of the counts charged Mr. Evans with making a false entry in bank records in violation of 18 U.S.C. §§ 1005 and 2, and seven counts charged him with misapplying bank funds in violation of 18 U.S.C. §§ 656 and 2. The government contends that the judgment of acquittal was erroneous because the evidence was sufficient to convict Mr. Evans on all counts and that the district court abused its discretion in granting a new trial. We affirm the judgment of acquittal on the misapplication counts and we reverse the judgment of acquittal and the grant of a new trial on the false entry counts.

## I.

Mr. Evans was the president of American Bank, N.A. of Rio Rancho. The bank was having financial difficulties, so a group of investors formed to purchase it from its owner. Mr. Evans worked with this group and was to remain as the bank's president upon completion of the change of control. The group filed the necessary application with the Office of the Comptroller of the Currency (OCC) for a change of control of the bank. This application stated that the group would acquire all of the outstanding common stock for $200,000. Additionally, the group would inject $2.5 million dollars of capital into the bank. Because of the bank's critical financial condition, the OCC ordered an independent audit. This audit showed that the bank was insolvent at the date of the examination.

In its decision letter to Mr. Evans, the OCC stated that in order to consummate the

change of control, the group had to deposit $1.8 million of capital (first tier) in the bank within five days and the additional $700,000 (second tier) ten days later. After the infusion of the first tier capital, one of the second tier investors dropped out, leaving a deficiency of $450,000. This shortfall occurred around the time the money was to be deposited, and the investment group moved quickly to recruit new investors. Although the group found people who were interested in investing, the potential investors were unable to come up with the necessary cash on such short notice. Consequently, Mr. Evans and members of the investment group decided to arrange bank loans from American Bank to these investors to purchase American Bank stock. The charges against Mr. Evans are based on these loans and the use of their proceeds to purchase bank stock.

The pattern shown at trial, with slight variations, was that an investor would apply for a line of credit of about $75,000. Almost immediately after approval of the loan, the investor would draw out $50,000 and use the money to buy bank stock. In almost every case, the stock was held in trust for the investor under someone else's name. The loan approval and funding sheets for these loans reflected various purposes for the loans, none of which was to buy bank stock. The loan approval and funding sheets for four investors stated that the loan was for working capital for their businesses. Two investors' sheets stated that the loan was for debt consolidation and personal expenses. One investor's sheet claimed that the loan was for home improvement and bill consolidation, and the final investor's sheet stated that the loan was for purchasing a home. Richard Brown, an OCC examiner, testified that because the majority of the money was used to purchase bank stock, these purposes were false and would mislead a bank examiner. Rec., vol. IV, at 818–30.

The government does not argue that making loans to purchase bank stock is illegal, that any of the loans were deficient, or that the bank did not have the authority to make the loans. The government's theory is that Mr. Evans and members of the investment group schemed to deceive the OCC by hiding from regulators the fact that bank loan proceeds were being used to buy bank stock, and they thereby injured the bank by depriving it of much needed new capital.

Prior to submitting the case to the jury, the district court dismissed four counts against Mr. Evans. At the conclusion of the trial, the jury found Mr. Evans guilty on all remaining counts.

■ The district court granted Mr. Evans a judgment of acquittal as to each count and, in the alternative, granted Mr. Evans a new trial on all counts. We review a district court's grant of a motion for acquittal under the same standard that the trial court applied when granting the motion. *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982).

> We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime. If the government has met that standard, we, as well as the trial court, must defer to the jury's verdict of guilty. This standard reflects a deep respect for the fact-finding function of the jury.

*Id.* at 301–02 (citations omitted).

## II.

■ The government appeals the judgment of acquittal as to the misapplication counts under 18 U.S.C. § 656. Section 656 makes it a crime for an officer or employee of any bank to "willfully misappl[y] any of the moneys, funds or credits of such bank." To prove a violation under this statute, the government must show that "(1) the defendant was an executive officer of the bank, (2) the bank was connected in some way to the Federal Reserve System, (3) the defendant willfully misapplied the funds of the bank, and (4) the defendant acted with the intent to injure or defraud that bank." *United States v. Haddock*, 961 F.2d 933, 934–35 (10th Cir.) [*Haddock II*], *cert. denied*, —— U.S. ——, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992).

In its brief, the government states that " 'a willful misapplication' of bank funds 'occurs when funds are distributed under a record which misrepresents the true state of the record with the intent that bank officials, bank examiners, or the [Federal Deposit Insurance Corporation] will be deceived.' " Aplt.Br. at 28 (quoting *United States v. Twiford*, 600 F.2d 1339, 1341 (10th Cir.1979)); *see also United States v. Davis*, 953 F.2d 1482, 1493 (10th Cir.1992) (also quoting *Twiford* in context of 18 U.S.C. § 657, a parallel statute protecting institutions insured by FSLIC), *cert. denied* —— U.S. ——, 112 S.Ct. 2286, 119 L.Ed.2d 210 (1992). The government argues that "[t]here is no requirement that the 'misapplication' itself be unlawful; *what makes it criminal is that the use of bank funds occurs with the specific intent to 'injure or defraud' the bank.* " [1] Aplt.Br. at 28–29 (quoting *Hernandez v. United States*, 608 F.2d 1361, 1364–65 (10th Cir.1979) (emphasis added)).

The court instructed the jury that "intent to injure or defraud the bank may be shown by [a knowing], voluntary act by the defendant, the natural tendency of which may have been to injure the bank." Rec., vol. XI, at 2312; *see also United States v. Tokoph*, 514 F.2d 597, 603–04 (10th Cir.1975). Mr. Evans allegedly loaned money under a false record and then used that money to recapitalize the bank. The natural tendency of loaning the money could not have been to injure the bank because the government did not attempt to prove at trial that any of the loans were not adequately collateralized or that the borrowers were not creditworthy.[2] In addi-

tion, the loans were made at a time when the bank had lending authority. Rec., vol. V, at 938.

■ The government also did not prove that using funds borrowed from the bank to buy stock in the bank tended to injure the bank. Buying bank stock with money loaned by that bank is not illegal. The only relevant statute states that a bank may not make loans on the security of its own shares. 12 U.S.C. § 83 (1988). The loans in this case were not secured by bank stock, but by other collateral.

The government argued at trial and also on appeal that Mr. Evans intended to injure the bank by depriving it of new capital. Aplt.Br. at 29. However, the government did not prove that using the loan proceeds as bank capital would tend to injure the bank, nor that Mr. Evans knew or should have known that using these loan proceeds for part of the capital infusion would tend to injure the bank. The only testimony tending to show that the bank officers believed the capital had to be "new money" came from Benjamin Lee Dante, an original member of the investment group.[3] He testified that he thought the capital needed to be "new money, not money loaned from the bank." Rec., vol. VIII, at 1496. He claims he made this assumption only on the basis of Mr. Evans' statement that they had to "watch what we are doing ... [w]e're all going to wind up going to jail." *Id.* 1496–97. In addition, Mr. Dante had previously testified that they hid the true purpose of the loans from the regulators because at the time they mistakenly thought that "it was illegal for loan proceeds

---

1. There is case law in this circuit stating that under some circumstances, "evidence of 'an intent to deceive' supplie[s] the necessary proof of criminal intent required by section 656." *United States v. Harenberg*, 732 F.2d 1507, 1511–12 (10th Cir.1984); *see also, Davis*, 953 F.2d 1482; *Twiford*, 600 F.2d 1339; Bruce A. Green, *After the Fall: the Criminal Law Enforcement Response to the S & L Crisis*, 59 Fordham L.Rev. S155, S159 (1991) (courts have interpreted section 656 broadly, reading the section to "simply require[ ] deceitful handling of bank funds"). We need not address the relationship between intent to deceive bank examiners and intent to injure the bank, however, because the government did not argue it. More significantly, the misapplication counts in the indictment specifically charge that Mr. Evans, with "intent to injure and defraud"

the bank, made loans "knowing that the loan majority of the proceeds would not be used for the purpose stated on the loan approval and funding sheets and instead the majority of the proceeds would be used to finance the Bank Investment Group's efforts to recapitalize" the bank. Aplt.App., doc. 1 at 6.

2. In fact, at oral argument, the government asserted that the condition of the loans was not relevant to its argument.

3. Mr. Dante pled guilty to misapplication of bank funds before Mr. Evans' trial, but was allowed to withdraw his plea after the judgment of acquittal.

from the bank to be used to purchase stock." Rec., vol. VII, at 1289; *see also* rec., vol. VI, at 1229.

Richard Brown, the OCC examiner, testified about the consequences of not having "new money" make up all of the required capital. Rec., vol. V, at 1002–03. The first consequence, he said, was that if the OCC had known where the money came from, the OCC might not have approved the change of control application. *Id.* at 1002. However, this assertion only establishes that the false purpose deceived the OCC, not that the actual transaction adversely affected the bank itself. Mr. Brown also testified that under appropriate accounting, this money could not have been used to make loans. *Id.* at 1002–03.

In earlier testimony, Robert Norris, another OCC examiner, gave his opinion that if the $2.5 million of needed capital were not all "new money," the bank would probably fail. Rec., vol. IV, at 770–71. This statement was only presented as Mr. Norris' opinion, and the government offered no other evidence that this lack of new capital contributed or could have contributed to the bank's failure. In fact, Mr. Brown testified extensively on cross-examination that seventy-one days after the change of control took place, the examiners caused the bank to become insolvent in spite of the capital infusion by charging-off around $3.5 million dollars of loans. Rec., vol. V, at 908–28. Mr. Norris also testified that under generally accepted accounting principles, "money borrowed from the bank which is used to purchase stock in the bank which is used to purchase stock in the bank would not qualify as capital. That's an accounting as well as a regulatory practice." Rec., vol. III at 604. He further stated that he would not have let the people invest their money. *Id.* at 605. However, he did not state how the bank itself would have been injured.

The district court asked the government whether a regulation existed that would prohibit making bank loans to investors to purchase stock in the same bank. Rec., vol. XI, at 2175. The government answered that an accounting regulation would have prohibited this money from being treated as capital. *Id.* at 2176. The court told the government to produce the regulation. *Id.* The government went on to state: "It could have been done if it was disclosed and the OCC says [sic] yes, but the regulation says they could not count this as part of the new paid[-in] capital." *Id.* It does not appear from the record that the government ever produced the regulation; nor has the government cited any such regulation to us on appeal.

In sum, the government had to prove, according to its own indictment, that Mr. Evans acted with intent to defraud the bank, *i.e.*, that the natural tendency of his actions was likely to injure the bank. The government did not meet this burden. The government presented sufficient evidence that had the loan approval and funding sheets stated that the proceeds of the loans were used to buy bank stock, the OCC might not have approved change of control. This evidence, however, is not sufficient to prove that Mr. Evans intended to injure or defraud that bank. The bank was insolvent when the investment group submitted its change of control application. The OCC examiners approved the application contingent upon the infusion of $2.5 million of bank capital. According to the government, that infusion did not fully take place because the bank loans were not "new" capital, and had the OCC examiners known it in time, they might not have approved the change of control. The government does not address the fact that if the OCC had not approved the change of control, the bank would have remained in its original insolvent condition. In fact, seventy-one days after the $2.5 million was injected, OCC examiners charged-off bank loans totaling around $3.5 million. These charge-offs returned the bank to its insolvent position, despite the $2.5 million capital infusion, so the OCC closed the bank.

In sum, Mr. Evans and the investors tried to bring the bank out of insolvency but failed in their attempt, and the investors lost $2.5 million. The government's theory that Mr. Evans intended to injure the bank by arranging to supply $450,000 of capital that was not "new" is thus untenable. We therefore affirm the district court's judgment of acquittal on these counts.

### III.

The false entry counts charge Mr. Evans with violating 18 U.S.C. § 1005. This section criminalizes a bank officer's "false entry in any book, report, or statement [of certain banks] with intent to ... deceive ... any agent or examiner." In granting the judgment of acquittal, the district court stated that "[t]he false entry must pertain to material information," Aplt.App., doc. 2 at 10, and then found that the entries, "if false, were not material," *id.* at 11.

We need not decide whether Congress intended that a false entry under section 1005 be material because we hold that the false entries made in this case were material. In the context of other false statement statutes, we have defined materiality as "a natural tendency to influence, or the capability of influencing" a decision maker. *United States v. Daily,* 921 F.2d 994, 1003 n. 9 (10th Cir.1990) (construing 18 U.S.C. § 1001, which forbids the "mak[ing] of any false, fictitious or fraudulent statements or representations to government officials"), *cert. denied,* —— U.S. ——, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991); *see also United States v. Haddock,* 956 F.2d 1534, 1550 (10th Cir.1992) [*Haddock I*] (construing 18 U.S.C. § 1014, which criminalizes "knowingly mak[ing] any false statement or report on loan and credit applications"). Actual reliance on the false entry need not be shown, only that it "had the capacity to influence" the decision. *Haddock I,* 956 F.2d at 1550. The determination of materiality is a legal issue which we review *de novo. See United States v. Brittain,* 931 F.2d 1413, 1417 (10th Cir.1991) (construing 18 U.S.C. § 1001).

Courts have held in other contexts that stating a false loan purpose is material. The Eighth Circuit, which recognizes materiality as an essential element of a section 1001 violation, upheld a conviction under the statute in a situation very similar to the instant case. *United States v. Whitaker,* 848 F.2d 914, 916 (8th Cir.1988). In *Whitaker,* the court held that false statements made by a bank president to a Federal Deposit Insurance Corporation examiner concerning the use of loan proceeds were material. During a visit by the examiner, the defendant told him that the proceeds of certain loans were to be used for business purposes, with only some of the proceeds to be used to buy "penny" stock. *Id.* at 915. In actuality, all of the funds were used to purchase stock. At the time the defendant made these statements, the bank examiner already had information from a confidential source and from the bank's records which alerted him to the fact that the loans were suspicious. The defendant argued that because the examiner already knew the loans were suspect, his statements could not have influenced the examiner. *Id.* at 916. The examiner testified at trial that had he known the true purpose of the loans, he would have inquired into the matter further and recommended that practice of making these types of loans be stopped immediately. *Id.* The court held that the false statements about the purpose of the loans were thus material because they had the "'capacity of influencing' the decisions of the FDIC." *Id.*[4]

Other courts have held that making false statements about the purpose of a loan is material under section 1014, which criminalizes making a false statement "for the purpose of influencing in any way the action of [certain banking entities]." Under this section, various circuits have held "that the stated purpose of a loan is a material fact." *United States v. Van Dyke,* 820 F.Supp. 1160, 1163 (N.D.Iowa 1993) (citing cases), *rev'd on other grounds,* 14 F.3d 415 (8th Cir.1994). The Seventh Circuit upheld a conviction under section 1014 when the defendant "falsely stated the purpose of the loan." *United States v. Shively,* 715 F.2d 260, 264 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). The court stated:

> There is no question that by signing a promissory note which contained a state-

---

4. The facts in the present case suggest that the misrepresentation by Mr. Evans was more material than that made by Mr. Whitaker. Mr. Whitaker claimed that some of the loan proceeds would go to purchase bank stock but then used all of the money for that purpose. The loan approval and funding sheets in the present case, however, did not even mention the possibility that the money would be used to purchase stock.

ment that he knew was false (that the purpose of the loan was "business expense and marketing operation") [the defendant] was making a false statement within the meaning of the statute.

*Id.*

■ Cases construing section 1005, at issue here, also support the conclusion that false entries with regard to loan purposes are material. The Ninth Circuit upheld a conviction under the statute where the jury found that the "bank's records of the loans were false in that they did not reflect either the true borrower or the actual purpose of the loans." *U.S. v. Wolf,* 820 F.2d 1499 at 1504 (9th Cir.1987). The Third Circuit was faced with an analogous situation under the statute in *United States v. Krepps,* 605 F.2d 101 (3d Cir.1979). In that case, the bank's books showed loans to two separate parties, but did not show that the defendant, an officer of the bank, was the ultimate beneficiary of the loans. *Krepps,* 605 F.2d at 109. The court held it did not matter that the named debtors were capable of repaying the loan and recognized their legal obligation to do so.

> [T]he fact that there is no evidence demonstrating that the named debtors are incapable of repaying the loans, or that they deny their legal obligation to do so, does not shield the true nature of the transactions.... Because those who are charged by law with the examination of these records have a significant interest in obtaining a full picture of the bank's actual condition ... the true nature of the transaction should have been entered in the bank's records.

*Id.* The Third Circuit's reasoning applies to the instant case as well. Whether the loans were fully collateralized is irrelevant as long as the books did not reflect the actual state of affairs. The evidence is sufficient to support the conclusion that Mr. Evans actively concealed the nature of the loans so that the examiners would not realize the source of the second tier financing.

■ The evidence presented at Mr. Evans' trial supports our conclusion that the entries were material. Richard Brown, an OCC national bank examiner, testified that if the true purposes of the loans had been listed on the funding sheets, he would have notified the OCC in Dallas. Rec., vol. V, at 846–47. He also testified that when he realized what the true purpose of the loans was, he did notify Bob Norris in the OCC office. *Id.* at 847. He said that the purpose of loans is important in general, *id.* at 856–57, and that the purpose of the loans was particularly important in this case because it had "a direct impact upon the balance sheet of the bank." *Id.* at 1000. In addition, he testified that had the loans been reflected accurately, the OCC might not have approved the application. *Id.* at 1002. Mr. Norris testified that the OCC might not have allowed the change in control if it had known that part of the second tier money was actually coming from loans made by the bank. Rec., vol. III, at 600. Sufficient evidence existed for the jury to find Mr. Evans guilty of the false entry violations. The judgment of acquittal therefore is reversed.

## IV.

Because we have reversed the district court's judgment of acquittal on the false entry counts, we must address the district court's alternative grant of a new trial on those counts. "We review the trial court's grant or denial of a motion for new trial under the abuse of discretion standard." *United States v. Muldrow,* 19 F.3d 1332, 1339 (10th Cir.1994). The district court gave several reasons for granting a new trial. We address all but the one relating to improper jury instructions, which pertains only to the misapplication counts on which we have affirmed the judgment of acquittal.

■ The district court held that the verdict was against the weight of the evidence. As the court noted, "[i]n deciding a motion for new trial, the court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." Aplt.App., doc. 2 at 13. The court went on to state that " 'the power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the ver-

dict.'" *Id.* (quoting 3 C. Wright, *Federal Practice & Procedure,* § 553, at 248 (2d ed. 1982)). The district court stated the correct standard, but we disagree that the evidence in this case preponderates heavily against the verdict.

■ The court determined that the verdict on the false entry charges was against the weight of the evidence because the loan applications established revolving lines of credit which "can be used for any legal purpose unless there is a specific restriction on it. None of these lines of credit had restrictions." Aplt.App., doc. 2 at 13–14. Although the promissory notes that were signed by the loan applicants described these loans as revolving lines of credit, the funding sheets and loan approval forms specifically stated false purposes for the loans. Mr. Evans argues that the promissory notes were the controlling documents because they were the only documents legally binding on the loan applicants. The loan funding and approval sheets, however, were part of the loan file which the OCC examiners reviewed. *See* rec., vol. XI, at 2188–91. These documents contained purposes which could not be read to authorize use of the proceeds to purchase bank stock. *See* rec., vol. IV, at 818–30. It is irrelevant for purposes of the false entry statute that the customers did not see these documents and were not bound by them, or that the purposes of the loans as stated in other documents in the file were broad enough to allow the money to be used to buy stock. It only matters that false entries which would deceive examiners were made in documents in the bank files.

The district court also said "there was strong evidence that the defendant acted in good faith in all respects.... The government did not negate the defendant's good faith and prove that he acted in bad faith." Aplt.App., doc. 2 at 14. We disagree. The evidence the government presented that Mr. Evans entered false purposes of the loans into the bank records with the intent to deceive the bank examiners was sufficient evidence for a jury to find that Mr. Evans acted in bad faith. Moreover, the government introduced other specific evidence that Mr. Evans did not act in good faith. Cindy Richards, vice-president of loan operations for the bank, produced the loan documents at the request of Mr. Evans. When she asked Anthony Aguilar, the bank's loan officer, what to put for the purpose of the loans, he said "'I don't care, just put something.'" Rec., vol. VI, at 1118. *See id.* at 1125. She acknowledged that Mr. Evans' initials appeared on the loan approval and funding sheets. *Id.* at 1128–36. She also recalled Mr. Evans stating at a board meeting, "[w]hat we're doing here is not exactly kosher." *Id.* at 1144. Laura Shaefer, who worked as Mr. Evans' personal secretary, also testified that Mr. Evans stated that "what we had done quote, 'was not exactly kosher,' unquote." *Id.* at 1194. The district court abused its discretion in granting a new trial on this ground because the evidence does not weigh heavily against the jury's verdicts on the false entry counts.

■ The district court further concluded that a new trial was warranted because "the government's closing argument was unduly prejudicial in that it referred to the multibillion dollar savings and loan bailout and its effect on taxpayers." Aplt.App., doc. 2 at 14. The court believed that this reference was inappropriate because the bank's insolvency had nothing to do with Mr. Evans' actions. *Id.* We have reviewed the closing argument, and the government's only reference to the savings and loan bailout or its effect on taxpayers was made in the context of "things that I submit really are not going to be relevant when you go in that jury room to make your determination as to that man's guilt or innocence." Rec., vol. XI, at 2320. The government made this reference during its reply to Mr. Evans' allegation of bad faith on the part of the OCC. *Id.* at 2322. The government explained that Congress had mandated that the OCC look at how a change of control will affect taxpayers and try to "avoid the same spectacle with commercial banks or nationally chartered banks as has happened with the S and L's and the $200 billion plus losses [that happened] there." *Id.* at 2323. A few sentences later the government said, "[i]f a bank fails that doesn't mean the banker committed a crime." *Id.*

Given the context in which the statement about the savings and loan failure was made, the statement does not rise to the level of prosecutorial misconduct. Even if the statement were improper, a new trial is not warranted because the remark in context could not have had a " 'substantial influence' on the outcome" of the trial or leave us "in 'grave doubt' as to whether it had such effect." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir.1990) (en banc). Consequently, we hold that the district court's grant of a new trial on the false entry counts was an abuse of discretion.

We AFFIRM the judgment of acquittal on the misapplication counts. We REVERSE the judgment of acquittal and the grant of a new trial on the false entry counts, and we REMAND for sentencing in accordance with the jury verdict.