FILED
United States Court of Appeals
Tenth Circuit

August 12, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALEJO CESAREO-AYALA,

Defendant - Appellant.

No. 08-3201

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:07-CR-20065-JWL-3)**

---

Rick E. Bailey, Conlee, Schmidt & Emerson, L.L.P., Wichita, Kansas, for
Defendant - Appellant.

James A. Brown, Assistant United States Attorney, (Marietta Parker, Acting
United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff -
Appellee.

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Alejo Cesareo-Ayala appeals from jury convictions of three drug offenses.

He challenges his conviction of possession of cocaine on the ground that there

was insufficient evidence to sustain the verdict. Alternatively, he argues that the

district court erred in denying him a new trial on the charge because "the evidence preponderate[d] heavily against the verdict." *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (internal quotation marks omitted). Although not challenging the sufficiency of the evidence to support his convictions on the two other charges—conspiracy to distribute cocaine and distribution of marijuana—he contends that the district court should have granted a new trial on those charges also. In addition, Mr. Cesareo-Ayala challenges the admission into evidence of statements made to him by an associate who had just been apprehended and was cooperating with the police. He argues that because the district court never determined that the statements were made in furtherance of a conspiracy, they were inadmissible hearsay and their use at trial violated the Confrontation Clause.

We have jurisdiction under 28 U.S.C. § 1291 and affirm. We reject the challenges to the sufficiency and weight of the evidence. And we agree with the government that the statements made by Mr. Cesareo-Ayala's associate were not offered into evidence for the truth of the matter asserted, so they were not hearsay and did not implicate the Confrontation Clause.

## I. BACKGROUND

The key witness against Mr. Cesareo-Ayala was Charles Klepac. To repay a debt that he owed Edward Mendez, Klepac agreed to connect Mendez with cocaine buyers. In late 2006 and early 2007 he arranged kilogram transactions

with two buyers:  Raphael Hogan (who testified for the government at trial) and Bill Pridey.

There were six transactions with Pridey.  Mendez drove Klepac to Pridey's house for each transaction.  Mr. Cesareo-Ayala, whom Klepac had not known previously, accompanied them four times.  On those occasions when Mr. Cesareo-Ayala was present, he took the cocaine from his jacket and handed it to Mendez, who passed it to Klepac.  Klepac then went alone into Pridey's house.  When Klepac returned to the car, he counted the money and handed it to Mendez, who gave most of it to Mr. Cesareo-Ayala.

Klepac and Hogan did not agree at trial about how many deals involved Hogan, but it was between seven and fourteen.  They took place at Klepac's house.  Mendez always participated, but Mr. Cesareo-Ayala was present for only three or four of these transactions, typically when the quantity of cocaine sold to Hogan was two or more kilograms.  On the first occasion, Mr. Cesareo-Ayala observed intently, though without saying anything.  On the other occasions he sat on Klepac's couch in another room, waiting for the deal to close.  When Klepac spoke to Mr. Cesareo-Ayala, he appeared not to understand.  (He and Mendez conversed only in Spanish in Klepac's presence; Klepac does not speak Spanish.)  Although Mendez never explained to Klepac what his relationship was with Mr. Cesareo-Ayala, he referred to Mr. Cesareo-Ayala as his uncle.  Klepac thought it obvious that Mr. Cesareo-Ayala was Mendez's superior and was "in

control of the cocaine." R. Vol. 2 at 219. And Hogan likewise believed that Mr. Cesareo-Ayala was supplying the cocaine.

During this period Klepac also brokered a smaller cocaine transaction between Mendez and a third buyer, Ronald Steward. Steward asked for four ounces; but when Mendez arrived with that amount, Steward bought only one, which annoyed Mendez. On another occasion Klepac attempted to set up a one-kilogram deal with Steward. Steward, however, assumed that he was buying only an ounce of cocaine. When he arrived at Klepac's house he did not have the money for the kilogram that Mendez and Mr. Cesareo-Ayala brought. He nonetheless tried to raise the necessary funds, placing phone calls while Mendez and Mr. Cesareo-Ayala waited. The two men left before Steward could raise the money.

On March 8, 2007, Steward was arrested on drug charges. He contacted Officer Shane Wright of the Kansas City Police Department's narcotics unit, for whom he had been an informant, and offered to provide his suppliers. Steward directed Wright and other officers to Klepac's house and identified Klepac as his source. At their instruction Steward telephoned Klepac to arrange a sale of a kilogram of cocaine. Klepac, who was intoxicated, said to try again the next day. On March 9 the two agreed to meet at Klepac's house for the deal. When the time for the meeting arrived, officers instructed Steward to call Klepac to say that he was en route but delayed. Eventually, Mendez arrived at Klepac's house with

a kilogram of cocaine, although the usual practice had been for Klepac to have the buyer present and his money counted before summoning Mendez. Klepac, who suspected that something was amiss, called Steward and told him that the deal was off and that he was sending the supplier away. Officers stationed outside the house arrested Mendez with the kilogram of cocaine in his waistband as he walked back to his vehicle.

Once in custody Mendez agreed to cooperate with the police to set up another cocaine delivery and bust. About an hour later Mr. Cesareo-Ayala called Mendez to ask whether he had Mr. Cesareo-Ayala's "stuff." Supp. R. at 1. Officer Raymond Nunez could hear the conversation and wrote down an English translation (the mobile phone was in walkie-talkie mode, which created pauses of about three seconds after each person spoke):

> [Mendez]: What's going on, Primo?
> [Mr. Cesareo-Ayala]: What happened?, Are you ready?
> [Mendez]: Nothing, I had trouble at the gas station[.]
> [Mr. Cesareo-Ayala]: Do you have my stuff?
> [Mendez]: Yes. I've got your money.
> [Mendez]: Do you want to meet at 7th and Central? I need two more.
> [Mr. Cesareo-Ayala]: Two more. Alright.
> [Mendez]: Yeah, two more of the Stuff. I'll give you your stuff and you give me two more.
> [Mr. Cesareo-Ayala]: I don't like 7th and Central.
> [Mendez]: Well, you tell me where. I'll meet you where ever. You tell me and I'll be there.
> [Mr. Cesareo-Ayala]: Remember where we played billiards? There. . . .
> [Mendez]: Okay. How much time?
> [Mr. Cesareo-Ayala]: 15 minutes.
> [Mendez]: Okay.

*Id.* (internal quotation marks omitted). The officers immediately set out for a bar that Mendez identified for them. They brought Mendez along to point out Mr. Cesareo-Ayala, whom they planned to arrest upon this identification.

While they were en route, Mr. Cesareo-Ayala again called Mendez to confirm that he was on his way. Nunez committed the conversation to memory and wrote out an English translation of the exchange about 30 minutes later.

> [Mendez]: What's going on?
> [Mr. Cesareo-Ayala]: Where are you?
> [Mendez]: I'm almost there; I am at the gas station.
> [Mr. Cesareo-Ayala]: Who do you have with you?
> [Mendez]: A friend I ran into at the fuel station.
> [Mr. Cesareo-Ayala]: Oh. I'm not there yet, I'm 7 minutes away.
> [Mendez]: Okay, me to[o]. I'll be pulling in right behind you then.
> [Mr. Cesareo-Ayala]: Okay.

*Id.* at 2 (internal quotation marks omitted).

In the bar's parking lot Wright saw Mr. Cesareo-Ayala arrive and exit his car holding a red bag. He walked to the rear of the building and returned without the bag. Other officers then moved in and arrested him. A search of the area behind the building yielded a red bag containing about 920 grams of marijuana.

After Mr. Cesareo-Ayala was taken into custody, Nunez interviewed him. During an unrecorded portion of the conversation (what the officers termed a "preinterview"), Mr. Cesareo-Ayala admitted that he was at the bar to obtain from Mendez the money from the sale of a kilogram of cocaine and to give Mendez two pounds of marijuana that had been requested earlier. R. Vol. 2 at 372.

Mr. Cesareo-Ayala then told Nunez that he could lead police to his supplier if he were released that night. Nunez informed him that release was impossible. The remainder of the conversation was tape-recorded, but Mr. Cesareo-Ayala did not repeat his admission about why he was at the bar and generally denied involvement in drug trafficking, although at the end of the interview he spoke of ordering a pound or two of drugs.

A superseding indictment charged Mr. Cesareo-Ayala with three offenses: conspiracy to distribute and possess with intent to distribute more than five kilograms of cocaine, *see* 21 U.S.C. § 846; possession with intent to distribute 500 grams or more of cocaine, *see id.* § 841; and distribution of marijuana, *see id.* Before trial he filed a motion in limine seeking to exclude on Confrontation Clause grounds any testimony about statements by Mendez that implicated him. (Mendez's attorney had indicated that Mendez would invoke his Fifth Amendment right to refuse to testify if called by either side as a witness.) The trial court provisionally admitted Officer Nunez's reports of the two March 9, 2007, conversations between Mendez and Mr. Cesareo-Ayala, subject to the government's making the showing required for admission of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). The court instructed counsel for the government "to ask the court when you believe the evidence has been sufficiently presented for the court to make a finding." R. Vol. 2 at 31–32.

At trial the government introduced the reports into evidence during the testimony of Officer Nunez, who described how he and his fellow officers set up and executed the bust. The government did not at any point ask the district court to make the predicate findings required under Rule 801(d)(2)(E).

Following the jury's verdict of guilty on all three charges, Mr. Cesareo-Ayala sought a judgment of acquittal notwithstanding the verdict under Federal Rule of Criminal Procedure 29 or, in the alternative, a new trial under Federal Rule of Criminal Procedure 33, contending that the evidence was insufficient to support his convictions. The district court denied relief.

## II. DISCUSSION

### A. Cocaine-Possession Charge

Mr. Cesareo-Ayala challenges the district court's denial of his motion for acquittal on the cocaine-possession charge. He contends that the evidence was insufficient to tie him to the cocaine found on Mendez upon his arrest on March 9, 2007.

> [I]n reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record de novo and ask only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.

*United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999) (internal quotation marks omitted). "While the evidence supporting the conviction must be

substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008) (brackets and internal quotation marks omitted).

To establish that a defendant possessed a controlled substance with intent to distribute, the government must prove that he "(1) possessed a controlled substance, (2) knew he possessed a controlled substance, and (3) intended to distribute the controlled substance." *Id.* at 1189. Under 18 U.S.C. § 2, anyone who "aids, abets, counsels, commands, induces or procures" the commission of an offense "is punishable as a principal." The government contends that the evidence was sufficient to show that Mr. Cesareo-Ayala aided and abetted the offense of possession of cocaine with intent to distribute, and we agree.

To begin with, the already-summarized evidence showed that on several occasions before March 9, 2007, Mr. Cesareo-Ayala had provided cocaine to Mendez for Klepac-brokered deals. It would thus be reasonable to infer that he was Mendez's supplier for the specific sale on March 9. Moreover, Mr. Cesareo-Ayala's own statements that day could readily support a finding of guilt beyond a reasonable doubt. His calls to Mendez—to ask what had happened and whether Mendez had his "stuff," and to set up a meeting for the transfer—certainly imply that he was involved in the aborted transaction with Steward; and then he confessed unequivocally to a police officer after his arrest.

Mr. Cesareo-Ayala also challenges the district court's denial of his motion for a new trial on the cocaine-possession charge because of the weakness of the government's case. The district court should grant such a motion "only in exceptional cases in which the evidence preponderates heavily against the verdict." *Evans*, 42 F.3d at 593 (internal quotation marks omitted). We review for abuse of discretion the district court's denial of a motion for new trial. *See id.*

We see no abuse of discretion here. We have already held that the evidence was sufficient to sustain the verdict on the charge. And we doubt that we could ever find an abuse of discretion by the district court in denying a new-trial motion based on the weight of the evidence when the evidence was sufficient to support the verdict. We note that courts of appeals routinely affirm the denial of such new-trial motions once they have upheld the sufficiency of the evidence. *See United States v. Rodriguez*, 457 F.3d 109, 118–19 (1st Cir. 2006); *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir. 2008); *United States v. LeGrand*, 468 F.3d 1077, 1080 (8th Cir. 2006); *United States v. Hunt*, 526 F.3d 739, 744 n.1 (11th Cir. 2008). To be sure, the district court, which has viewed the trial evidence first-hand, may order a new trial when it perceives that the jury improperly weighed some of that evidence; but it would be a rare case in which an appellate court could make that kind of judgment. We affirm the district court's denial of a new trial on this charge.

## B.     Conspiracy and Marijuana Charges

Mr. Cesareo-Ayala challenges the denial of his motion for a new trial on the conspiracy and marijuana charges against him.  Because he has not also challenged the sufficiency of the evidence supporting the verdicts on those charges, we could—for the reasons stated in the preceding paragraph—summarily conclude that, given the uncontested sufficiency of the evidence, the district court could not have abused its discretion in denying a new trial.  Nevertheless, we will discuss the evidence supporting these two convictions.

To establish a conspiracy, the government must prove:  "(1) the defendant's agreement with another person to violate the law; (2) his knowledge of the essential objective of the conspiracy; (3) his knowing and voluntary involvement; and (4) interdependence among the alleged coconspirators."  *United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir. 2006) (internal quotation marks omitted).  "[T]he absence of any direct evidence of a conspiracy is immaterial so long as there is sufficient circumstantial evidence of a conspiracy to support a finding of guilt beyond a reasonable doubt."  *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004) (internal quotation marks omitted).

Mr. Cesareo-Ayala trains his fire on the knowing-and-voluntary-involvement element of the offense.  He argues that Klepac—whose credibility he assails—was the sole source of evidence on this point and that other witnesses "could only testify that [Mr. Cesareo-Ayala] was present during several drug

-11-

transactions," not that he took an active role. Aplt. Br. at 23. The credible evidence against him, he says, paints him as a "mere observer" of the cocaine deals. *Id.* at 24.

We are not persuaded. We see no reason why a fact-finder could not rationally credit Klepac's testimony. Although he could not be precise about some details, his account was internally consistent. Moreover, his account was corroborated by Hogan's observations and by Mr. Cesareo-Ayala's own confession to the police. The district court did not abuse its discretion in rejecting the contention that "the evidence preponderate[d] heavily against the verdict." *Evans*, 42 F.3d at 593.

As for the marijuana count, Mr. Cesareo-Ayala argues only that the evidence was insufficient to tie him to the marijuana found in the red sack.[1] But Officer Wright testified that when Mr. Cesareo-Ayala exited his vehicle at the bar, he was holding a red sack. Mr. Cesareo-Ayala then was observed going to the rear of the building and returning without the sack, which was later found

---

[1]Mr. Cesareo-Ayala's opening brief misstates the charge as possession of marijuana with intent to distribute it. But the government's brief properly states that the charge was distribution of marijuana; and it argues why the evidence showed "distribution," as defined in 21 U.S.C. §§ 802(11) ("distribute" means "to deliver") and 802(8) (meaning of "deliver" includes "attempted transfer"). *See United States v. Jackson*, 213 F.3d 1269, 1296 (10th Cir.) ("[C]ourts have construed the term "distribution" broadly to include other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price." (internal quotation marks omitted)), *vacated on other grounds*, 531 U.S. 1033 (2000).

behind the building. The sack contained a substantial quantity of marijuana. Moreover, after his arrest Mr. Cesareo-Ayala told Officer Nunez that he had come to the bar to receive money from Mendez and deliver marijuana to him. Mr. Cesareo-Ayala is correct that there could have been more evidence of guilt—for example, no fingerprints were found on the sack and no one had checked the rear of the building to see if the presence of the bag preceded Mr. Cesareo-Ayala's arrival. But such evidence was not essential. The new-trial motion was properly denied.

## C. Admission of Mendez's Statements

Mr. Cesareo-Ayala contends that the district court committed reversible error by admitting evidence of statements by Edward Mendez without making the findings required for coconspirator statements to be treated as nonhearsay under Federal Rule of Evidence 801(d)(2)(E), the so-called coconspirator exception to the hearsay rule. He asserts that the statements were both inadmissible hearsay and barred by the Confrontation Clause of the Sixth Amendment. Although he states that his challenge relates to all of Mendez's statements admitted at trial, he addresses only Mendez's statements to him in two telephone conversations. We will therefore consider only those statements. *See United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009) ("We have no obligation to take on the role of [defense] counsel and review the trial transcript to see whether we can find

[error]. . . . We therefore limit our review to the specific allegations of [error] recited" by the defendant.).

The government contends that Mendez's statements in the two conversations are not hearsay and do not implicate the Confrontation Clause because they were not "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c) (defining hearsay); *see Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). We agree and reject Mr. Cesareo-Ayala's arguments.[2] As a result, we need not determine whether the district court improperly admitted the statements as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).

It is unclear whether Mr. Cesareo-Ayala is challenging statements in the second conversation, but we can promptly dispose of such a challenge in any event. The conversation was as follows (with bracketed numbers added to label Mendez's statements):

> [1] [Mendez]: What's going on?
> [Mr. Cesareo-Ayala]: Where are you?

---

[2]Although the government failed to argue in district court that Mr. Mendez's statements were not hearsay because they were not offered for the truth of the matter asserted, we can affirm a judgment on any ground established by the record, so long as doing so is not unfair to the appellant. *See United States v. Oldbear*, 568 F.3d 814, 821 n.1 (10th Cir. 2009). Given the absence of any possible factual dispute, the clarity of the issue, and the failure of Mr. Cesareo-Ayala to argue that the delay in raising the issue has prejudiced him in responding on appeal, we see no unfairness in affirming on this ground.

-14-

[2] [Mendez]:  I'm almost there; I am at the gas station.
[Mr. Cesareo-Ayala]:  Who do you have with you?
[3] [Mendez]:  A friend I ran into at the fuel station.
[Mr. Cesareo-Ayala]:  Oh.  I'm not there yet, I'm 7 minutes away.
[4] [Mendez]:  Okay, me to[o].  I'll be pulling in right behind you then.
[Mr. Cesareo-Ayala]:  Okay.

Supp. R. at 2 (internal quotation marks omitted).  Statement 1—"What's going on?"—asserts nothing.  It is not a hearsay declaration.  Statements 2 and 4 assert Mendez's location.  Even if they are inadmissible hearsay, their admission was harmless; they could not have prejudiced Mr. Cesareo-Ayala in any way.  Statement 3—that Mendez was with a friend whom he met at the fuel station— was not offered for its truth (indeed, it was clearly untrue, because he was with police officers); so it, too, was not hearsay.

Mr. Cesareo-Ayala's principal focus is the first conversation, which we repeat:

[1] [Mendez]:  What's going on, Primo?
[Mr. Cesareo-Ayala]:  What happened?, Are you ready?
[2] [Mendez]:  Nothing, I had trouble at the gas station[.]
[Mr. Cesareo-Ayala]:  Do you have my stuff?
[3] [Mendez]:  Yes.  I've got your money.
[4] [Mendez]:  [a] Do you want to meet at 7th and Central? [b] I need two more.
[Mr. Cesareo-Ayala]:  Two more.  Alright.
[5] [Mendez]:  Yeah, two more of the Stuff.  I'll give you your stuff and you give me two more.
[Mr. Cesareo-Ayala]:  I don't like 7th and Central.
[6] [Mendez]:  Well, you tell me where.  I'll meet you where ever. You tell me and I'll be there.
[Mr. Cesareo-Ayala]:  Remember where we played billiards?  There. . . .
[7] [Mendez]:  Okay. How much time?

-15-

[Mr. Cesareo-Ayala]:  15 minutes.
[8] [Mendez]:  Okay.

Supp. R. at 1 (internal quotation marks omitted).  Statements 1 and 4(a) are questions that assert nothing, again not hearsay.[3]  If 6, 7, and 8 contain any hearsay, their admission was clearly harmless; they relate only to the time and place for their rendezvous.  The remaining statements, 2, 3, 4(b), and 5, were not hearsay because they were not offered for their truth; indeed, they were demonstrably false:  Mendez did not have trouble at the gas station, he had no money for Mr. Cesareo-Ayala, and he had no intent to obtain more "stuff" from Mr. Cesareo-Ayala.

Mr. Cesareo-Ayala, however, argues as follows:

The statements by Mendez in both walkie-talkie conversations . . . make indirect implicit assertions and were so intended by Mendez. Comments such as "I've got your money" were intended to make the inculpatory assertion that the person on the other end of the telephone was engaged in a business transaction with Mendez.  "I need two more" is intended to assert that Mendez wished to have the person on the other end deliver additional drugs and that this was in addition to drugs delivered in the past. . . .  Mendez, knowing that law enforcement was listening to his conversation, was intending to make assertions for their benefit about the identity of the person on the telephone and the nature of their relationship.  It was these implicit assertions and the truth of those assertions which made these conversations relevant and useful to the Government's case.

---

[3]We recognize that in some circumstances a question may have imbedded assertions.  *See United States v. Summers*, 414 F.3d 1287, 1299–1300 (10th Cir. 2005).  But that is not the situation before us.

Aplt. Reply Br. at 2–3. This argument misconceives what it means to say that a statement is "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). It appears to say that if a statement is used as evidence of a proposition, the declarant has "asserted" that proposition and the statement is therefore hearsay. But that is not correct. To give an obvious counterexample, a statement may be offered simply to prove that the speaker was physically able to speak, or could speak the language in which the statement is uttered. In that circumstance the truth of the statement is immaterial, and the statement is not offered for a hearsay purpose, even though it may well support an assertion of the prosecution.

The conversation between Mendez and Mr. Cesareo-Ayala helped prove that the two men had a business relationship, but that relationship is established by the general subject matter of their discussion, without regard to the truth of anything that either man asserted. The probative value of the conversation derived not from any "implicit assertion" made by Mendez for the benefit of the officers but from the statements by Mr. Cesareo-Ayala, both in initiating the conversation and in responding to Mendez. The obvious purpose of including what Mendez said in presenting the conversation to the jury is that Mr. Cesareo-Ayala's words can be properly understood only in the context of Mendez's remarks. In context, Mr. Cesareo-Ayala's statements strongly suggest that he was involved in the (aborted) transaction with Steward and wanted to get together

-17-

with Mendez to obtain the proceeds.  If the jury could not hear Mendez's side of the conversation, however, it would have to speculate about what was really going on.[4]

The role of the hearsay rule (and the related component of the right to confrontation) is to protect against statements that cannot be challenged by cross-examining the speaker.  Cross-examination can expose problems with the speaker's perception, memory, or truthfulness.  But Mendez's perception, memory, and truthfulness were irrelevant to the purpose for which the government offered his statements.

A recent Sixth Circuit opinion illustrates this point.  In *United States v. Rodriguez-Lopez*, 565 F.3d 312 (6th Cir. 2009), the defendant had acted as a lookout for a heroin seller dealing with an undercover officer.  *See id.* at 313–14.  When federal agents moved in to arrest the seller, the defendant tried to drive out of the parking lot where the buy had occurred.  *See id.* at 314.  Other agents stopped him for questioning.  During this questioning the defendant received multiple calls on his mobile phone.  An agent answered ten of these calls; each time, the caller was a person seeking to buy heroin.  *See id.*  After the defendant

---

[4]The concurring opinion compares the context provided by Mendez's remarks to the "context" provided by the police officers' statements to the defendant in *United States v. Collins*, No. 08-3119, slip op. at 8–9 (10th Cir. Aug. 4, 2009).  But there is a distinction between (1) brief nonassertive statements made in response to a phone call initiated by the defendant, as in this case, and (2) lengthy assertions (indeed, accusations of lying and even guilt) made by police officers during custodial interrogation of the defendant, as in *Collins*.

-18-

was charged with conspiracy to distribute heroin, the district court granted the defendant's motion to exclude the callers' statements as hearsay. *See id.* The government appealed and the Sixth Circuit reversed. The government offered the statements, the court said,

> not for their truth, but as evidence of the fact that they were made. The fact that [the defendant] received ten successive solicitations for heroin is probative circumstantial evidence of his involvement in a conspiracy to distribute heroin.

*Id.* at 315. Although the callers may have been implicitly asserting that the defendant was able to supply them with heroin, and although "the government s[ought] to introduce the calls because they support[ed] an inference that [the defendant] was involved in dealing heroin," the calls were admissible because that inference "d[id] not depend on the callers' truthfulness, memory, or perception—the core credibility concerns that lie behind the hearsay rule." *Id.*

The same is true here. Given the clear nonhearsay purpose for admitting Mendez's statements, the admission of the statements violated neither the hearsay rule nor the Confrontation Clause.

## III. CONCLUSION

We AFFIRM the judgment of the district court.

08-3201, United States v. Cesareo-Ayala (Second Revised)

**KELLY**, Circuit Judge, concurring.

I concur in the court's opinion with the exception of Part II(C).

This court has previously made clear that "a district court can only admit coconspirator statements if it holds a <u>James</u> hearing or conditions admission on forthcoming proof of a predicate conspiracy through trial testimony or other evidence." <u>United States v. Townley</u>, 472 F.3d 1267, 1273 (10th Cir. 2007) (internal quotation marks omitted). In this circuit, we strongly prefer the former. <u>Id.</u> Unfortunately, the district court opted not to comply with this preference. In fact, the district court stated that it "respectfully disagree[d] with the Tenth Circuit about what is the best way to [assess statements offered pursuant to Fed. R. Evid. 801(d)(2)(E)]. I think it's a rare case where holding a <u>James</u> hearing is really worth doing, and I don't think this is a case that it's worth doing . . . ." Tr. 31.

Opting to "provisionally admit subject to tying up," Tr. 31, the court informed Mr. Cesareo-Ayala that he had sufficiently preserved his objection to the admission of Mr. Mendez's statements through his motion in limine. Tr. 32; <u>see also</u> 1 Supp. R. (Doc. 57). The court further assured Mr. Cesareo-Ayala that he would "have an opportunity to be heard again [on the admission of those statements] before a final ruling by the court," Tr. 32, that it would analyze the statements under Fed. R. Evid. 801(d)(2)(E), Tr. 32, and that it would likely apply

a higher level of scrutiny to them because of their post-arrest nature, Tr. 30. As a result, Mr. Cesareo-Ayala did not object when the government moved to admit Mr. Mendez's telephone statements into evidence. See Tr. 364, 370. Of course, the better practice would have been for Mr. Cesareo-Ayala to reinforce his objection at that time; however, in light of the district court's prior assurances, Mr. Cesareo-Ayala's failure to do so is certainly understandable and should not be construed as forfeited error. Notwithstanding its disagreement with Tenth Circuit policy, had the district court followed the "strongly preferred" James procedure, it would have avoided altogether the complications we now face. See Townley, 472 F.3d at 1273; United States v. Urena, 27 F.3d 1487, 1490-91 (10th Cir. 1994). This is exactly the type of problem that would have benefitted from argument and a careful review by the district court.

That said, I turn now to the substance of Mr. Cesareo-Ayala's arguments. First, I question whether any of Mr. Mendez's statements occurring after his arrest would qualify as non-hearsay under Fed. R. Evid. 801(d)(2)(E).[1] Conspirator statements made after the conspiracy has ended are inadmissible under Rule 801(d)(2)(E) because they are not made in furtherance of the conspiracy. Krulewitch v. United States, 336 U.S. 440, 442-44 (1949). When the

---

[1] It is clear that Mr. Cesareo-Ayala's statements are admissible as party admissions, Fed. R. Evid. 801(d)(2)(A), Townley, 472 F.3d at 1274, and also under Fed. R. Evid. 801(d)(2)(E), given the requisite findings, notwithstanding that Mr. Mendez was arrested. See United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir. 1982).

conspiracy's objectives have been achieved or have been rendered impossible, the conspiracy has ended. See Wong Sun v. United States, 371 U.S. 471, 490 (1963); United States v. Perez, 989 F.2d 1574, 1579 (10th Cir. 1993) (en banc). When a declarant coconspirator has been apprehended, his confession and admissions to law enforcement are not in furtherance of the conspiracy. Fiswick v. United States, 329 U.S. 211, 217 (1946). Here, Mr. Mendez's post-arrest statements, made for the purpose of inculpating Mr. Cesareo-Ayala and assisting law enforcement, do not appear to be in furtherance of the conspiracy. See 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence §§ 8.60, 8.61, 8.62 (3d ed. 2007) (suggesting that a statement by an arrested coconspirator declarant is not made during the course of the conspiracy or in furtherance of it). But see United States v. Alonzo, 991 F.2d 1422, 1426 (8th Cir. 1993) (holding that it was not plain error to admit recorded statement of cooperating and arrested coconspirator because defendant's statements were clearly in furtherance of the conspiracy and "a certain amount of otherwise inadmissible conversation may be admitted to avoid jury confusion.").

Second, and more specifically, I am not so sure that Mr. Mendez's statements in the first conversation were not hearsay. As the court notes and as is confirmed by the record, the government never argued in the district court that the statements were not hearsay, let alone that they should come in as background to understand Mr. Cesareo-Ayala's statements. Tr. 30-31. I agree with Mr.

-3-

Cesareo-Ayala that several of Mr. Mendez's statements were intended by Mr. Mendez to be assertions that Mr. Cesareo-Ayala was a drug supplier. Aplt. Reply Br. at 4. Specifically, the following:

- "Yes, I've got your money."

- "I need two more."

- "Yeah, two more of the Stuff. I'll give you your stuff and you give me two more."

1 Supp. R. at 1. As Mr. Cesareo-Ayala points out, "[Mr.] Mendez, knowing that law enforcement was listening to his conversation, was intending to make assertions for their benefit about the identity of the person on the telephone and the nature of their relationship." Aplt. Reply Br. at 4. In other words, Mr. Mendez intended to inculpate Mr. Cesareo-Ayala for the benefit of law enforcement.

Thus, this case is readily distinguishable from those involving anonymous customer calls to a defendant engaged in the drug or bookmaking trade. See United States v. Rodriguez-Lopez, 565 F.3d 312, 314-15 (6th Cir. 2009); United States v. Long, 905 F.2d 1572, 1579-80 (D.C. Cir 1990); United States v. Zenni, 492 F. Supp. 464, 466 (E.D. Ky. 1980); see also United States v. Jackson, 88 F.3d 845, 848 (10th Cir. 1996). In United States v. Summers, 414 F.3d 1287, 1300 (10th Cir. 2005), we discussed Long and distinguished it on the basis that nothing suggested that the unidentified caller intended to assert that the defendant was

engaged in narcotics distribution. Given that the evidence plainly suggests that Mr. Mendez intended to make such an assertion, Mr. Cesareo-Ayala had a reasonable argument that the government should not be permitted to offer these statements without allowing him the opportunity for cross-examination. See United States v. Reynolds, 715 F.2d 99, 103-04 (3d Cir. 1983) ("[S]tatements containing express assertions may also contain implied assertions qualifying as hearsay and susceptible to hearsay objections."). Allowing the government to do so results in a potential conflict with the Supreme Court's holding in Crawford. See Crawford v. Washington, 541 U.S. 36, 59 (2004) ("Testimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."). Perhaps the government could have offered another rationale for admissibility, such as background, see Alonzo, 991 F.2d at 1426-27, with an opportunity for the court to consider the danger of unfair prejudice or a limiting instruction. But the government did not and Mr. Cesareo-Ayala can hardly be faulted for not responding to an unknown purpose. Moreover, we recently commented that admission of the hearsay statements of law enforcement personnel to provide "context" for a defendant's admissions has the potential for abuse: "Invoking the word 'context' does not permit an end-run around the hearsay rules such that the government may smuggle into evidence all interviewer statements." United States v. Collins, No. 08-3119, slip op. at 8-9, —F.3d—

-5-

(10th Cir. Aug. 4, 2009).  This is even more true when the declarant has become an instrument of law enforcement and the defendant cannot confront the declarant.

Regardless, I am persuaded that the admission of these statements did not have a substantial influence on the verdict and was harmless beyond a reasonable doubt.  Fed. R. Crim. P. 52(a); <u>United States v. Rivera</u>, 900 F.2d 1462, 1469-70 (10th Cir. 1990) (en banc).  I therefore concur in the result the court has reached on this issue.